UNITED STATES of America

v.

Oliver L. NORTH, Appellant.

No. 89–3118.

United States Court of Appeals,
District of Columbia Circuit.

Nov. 27, 1990.

As Amended Nov. 30, 1990.

Lawrence E. Walsh, Independent Counsel, was on the petition for rehearing and/or suggestion for rehearing en banc.

Brendan V. Sullivan, Jr., Barry S. Simon, Paul Mogin, Nicole K. Seligman and John D. Cline were on the opposition to the petition for rehearing and/or suggestion for rehearing en banc.

Before WALD, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

ORDER

PER CURIAM.

On consideration of appellee's petition for rehearing filed September 4, 1990 and appellant's opposition thereto, it is

ORDERED, by the Court, that the petition for rehearing be granted in part and denied in part, and that Section II of our prior opinion be withdrawn and replaced by Section IV of the opinion filed herein, and point (2) of the Summary relating thereto be withdrawn and replaced by the following: "(2) The District Court's jury instructions on Count 9 did not, taken as a whole, pose a genuine risk that the jury would be confused." The reasons are set forth more fully in the opinion of the court filed herein this date.

Opinion dissenting as to Parts I, II & III filed by Chief Judge WALD.

PER CURIAM:

In its petition for rehearing, the Independent Counsel ("IC") has raised several new issues regarding our original disposition. As we explain below, we believe that all but one of the IC's claims lack merit. We therefore grant in part and deny in part the petition for rehearing and modify our original opinion, 910 F.2d 843, accordingly.

I. Immunized Testimony at Trial

■ The IC claims that we misapplied *United States v. Rinaldi*, 808 F.2d 1579 (D.C.Cir.1987), in remanding "for a massive inquiry into 'the *taint* of the testimony and the *derivation* of the testimony.'" Petition for Rehearing at 7–8 ("Pet. for Reh'g") (quoting Majority Opinion 910 F.2d at 866 ("Maj. Op.") (emphasis in original)). The IC's argument rests on the *ipse dixit* that "the prosecution's freedom from taint establishes that its evidence was necessarily derived independently" and therefore that the inquiry mandated by *Rinaldi* would be "superfluous." Pet. for Reh'g at 8. This bold proposition, however, would convert *Kastigar*'s total prohibition on use, *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1973), to a mere ban on significant prosecutorial expo-

sure to the immunized testimony. It simply does not follow that insulating prosecutors from exposure automatically proves that immunized testimony was not used against the defendant. *Kastigar* is instead violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of *how or by whom* he was exposed to that compelled testimony. Were the rule otherwise, a private lawyer for a witness sympathetic to the government could listen to the compelled testimony and use it to prepare the witness for trial. The government would presumably thereby gain the advantage of use of the immunized testimony so long as it did not actually cooperate in that effort. This interpretation of *Kastigar* ("Look ma, no hands") pressed by the IC, if accepted, would enormously increase the risk of providing immunized testimony. To reject it, it is unnecessary to decide whether, as North asserts, particular significance should be placed on the fact that other government personnel in the legislative and executive branches outside the Independent Counsel's office were, after exposure to immunized testimony, actively involved in preparing witnesses.

■ Indeed, *Rinaldi* explicitly recognizes that witnesses' exposure to immunized testimony can taint their trial testimony irrespective of the prosecution's role in the exposure and that an inquiry is therefore necessary into whether the content of witnesses' testimony was derived from or motivated by the immunized testimony. It specifically mandates an inquiry into what a witness knew prior to exposure to the immunized testimony and what information she gleaned from that exposure: "[t]here is accordingly a question of fact as to how much Reardon [the witness] knew prior to that meeting [at which she was exposed to the immunized testimony] and what additional knowledge, if any, she may have

gained as a result of listening to Rinaldi's testimony." 808 F.2d at 1583. And even where the witness testifies from personal knowledge, use within the meaning of *Kastigar* may occur, as *Rinaldi* points out, if the immunized testimony influenced the witness' decision to testify. Rather than recognizing, as the IC claims, that a *Kastigar* hearing may not focus on the "psychological processes of witnesses," Pet. for Reh'g at 7 n. 4, *Rinaldi* directed inquiry into whether a witness' testimony "was *motivated by,* and therefore indirectly derived from, Rinaldi's immunized statements to the police." 808 F.2d at 1584 n. 7 (emphasis added).[1] Our opinion is thus entirely consistent with *Rinaldi* in calling for an inquiry on remand into the content and circumstances of witnesses' testimony.

■ Our dissenting colleague does not disagree with us on this central point so vigorously disputed by the IC—that the content and circumstances of testimony given by a witness exposed to the defendant's immunized testimony may constitute "use" of the immunized testimony in violation of a defendant's constitutional rights regardless of the prosecutor's "fault." But she does contend that we have extended *Rinaldi* by insisting that the testimony of any witness exposed to the immunized testimony be "pre-recorded" in much the same way as prosecutors memorialize their investigative material, including witnesses' statements, so as to be able to prove in a *Kastigar* hearing that the government has obtained no leads from the immunized testimony. We did not, however, set forth such a requirement; we only said this burden "may" be met by "cann[ing]" the testimony beforehand, Maj.Op. at 872–873, just as wise prosecutors meet their burden of showing independent investigation by "canning" the results of the investigation before the defendant gives immunized testi-

---

1. Three of our sister circuits require that the government prove that a witness was not motivated to testify by exposure to immunized testimony. *See United States v. Brimberry,* 803 F.2d 908, 915–17 (7th Cir.1986), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987);

*United States v. Hampton,* 775 F.2d 1479, 1489 (11th Cir.1985); *United States v. Kurzer,* 534 F.2d 511, 517–18 (2d Cir.1976). And we know that North's immunized testimony motivated one witness, Robert C. McFarlane, to expand upon his testimony. *See* Maj.Op. at 864–865.

mony.[2]

To be sure, if such steps are not taken, it may well be extremely difficult for the prosecutor to sustain its burden of proof that a witness exposed to immunized testimony has not shaped his or her testimony in light of the exposure, or as the *Rinaldi* court observed, been motivated to come forward and testify in light of the immunized testimony. But we surely did not mean to preclude the use of any techniques of which we are not aware, nor did we mean to even suggest that the prosecutor was barred from trying to show in any fashion that a witness' testimony was not influenced by the immunized testimony.[3]

■ What we did insist upon, however—and here we quite definitely part company with the Chief Judge—is that the prosecutor has to *prove* that witnesses who testified against the defendant did not draw upon the immunized testimony to use it against the defendant; the burden of disproving use cannot, under *Kastigar*, be shifted onto the defendant, nor can the defendant be required to assume the burden of going forward with evidence that puts in issue the question of use. Most important, the defendant is entitled to a *hearing* at which he would be able to challenge the prosecution's case for non-use.

Although our dissenting colleague expresses concern over the special institutional interests of the Independent Counsel, she does not suggest, nor could it plausibly be suggested, that the defendant's constitutional rights are somehow lessened because he was prosecuted by the Independent Counsel rather than a United States attorney or the criminal division of the Justice Department. Therefore, the dissent's rationalization (truly *post hoc*) of the district judge's refusal to put the IC to its proof at a hearing must apply to any case in which the defendant gave immunized public testimony to a congressional committee. The dissent's focus is on executive branch misconduct, but congressional committees have held highly publicized hearings into a number of other perceived problems, like the influence of organized crime, corruption in the labor movement, dubious practices on Wall Street, and even, as some will recall, communist influence in Hollywood. We cannot imagine what subjects will be of public and thus congressional interest in the future. We must assume that any American could be compelled to testify in return for use immunity under 18 U.S.C. § 6005 (1988), which authorizes Congress to grant that immunity, even over protests of the prosecutor, independent or otherwise. And thus the novel approach suggested by our colleague would apply to any person who finds him or herself in the position of being prosecuted after having testified publicly before Congress.

The dissent argues that the district judge was not obliged to hold a hearing to determine whether or not the witnesses changed or shaped their testimony (or, for that matter, offered to testify) because of the immunized testimony. It is not because the question is irrelevant, according to the dissent, but rather because the IC produced something like "a *prima facie* case" that the witnesses' testimony was not tainted. Dissent on Pet. for Reh'g at 954. We are rather puzzled because we do not perceive that the IC put on any evidence whatsoever

2. We frankly do not understand why the Chief Judge would wish to read our opinion now—as she did *not* do in her earlier dissent—in such a restrictive and unnatural way, turning a "may" into a "must." Dissent on Pet. for Reh'g at 2–3. Nor do we comprehend why the dissent would wish us to set down "guidelines" to control how the parties might litigate this issue when such guidelines would, in effect, decide questions not before us and would represent "an unneeded and unprecedented incursion into the trial court's discretion." Dissent on Pet. for Reh'g at 956.

3. Chief Judge Wald describes *Rinaldi* as standing only for a rule of "inevitable discovery," *i.e.*, that if the prosecutor would have inevitably come upon certain information from a particular witness, it matters not if the witness' testimony before the grand jury was shaped by the immunized testimony. *Rinaldi*, however, was focused at least with respect to *that* witness only on the question whether facts presented to the grand jury were independently gathered, not the issue with which we are confronted—whether the witness' testimony was shaped and influenced by exposure. Indeed, our dissenting colleague appears to concede that *Kastigar* bars the use of a witness whose testimony is so shaped.

directed to this issue. Indeed, the district judge (as did our colleague) relied on an in-chambers review, a sort of "self-directed ... inquiry," *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983), to satisfy himself that there was no taint. Of course, this "review" neatly avoided any cross-examination of witnesses who were admittedly exposed to the immunized testimony (which, coupled with the switch in testimony of one key witness, may be at the core of this dispute). Even if such a proceeding could substitute for an adversary hearing (which we think quite a remarkable proposition), it could not possibly do so in this case because the district judge believed that independent exposure can *never* violate *Kastigar*. *See United States v. Poindexter*, 698 F.Supp. 300, 307, 313–14 (D.D.C.1988). Therefore, his "preliminary" *Kastigar* finding, which the dissent describes as based on "a thorough reading of preliminary witness interviews and the grand jury record," Dissent on Pet. for Reh'g at 955, seems not only inadequate, but quite beside the point as well.

If the prosecutor were to demonstrate through testimony that a particular witness exposed to the immunized testimony had not been affected by the exposure, for example, by showing that the witness had set down his story before exposure, then the burden of going forward would shift to the defendant to challenge that version. But the dissent constructs the *"prima facie* case" out of whole cloth by relying merely on the district court's admonition to witnesses to testify based on personal knowledge,[4] as if that satisfied the *prosecutor's Kastigar* burden.

The IC (and the district court) obviously wished to avoid cross-examination of the exposed witnesses. Some might convincingly testify that their exposure had no effect on their trial or grand jury testimony. Others might well testify that they simply were unable to determine just how much exposure affected their testimony, in which case that uncertainty would surely be a grave problem for the party with the burden of proof—the prosecutor. In this case, however, we know that at least one crucial witness changed his testimony before Congress after hearing the immunized testimony, and then presumably told the modified version to the trial jury. If by some alchemy the burden of going forward at the outset were to be shifted to the defendant (which we think plainly impermissible), we find it impossible to understand why that undisputed showing alone would not satisfy that burden. Why does it not meet even our dissenting colleague's requirement for a contradiction between testimony prior to exposure and testimony subsequent to exposure?[5]

When all is said and done, the district judge denied the defendant a hearing to which the Constitution entitled him. The Chief Judge's new formulation of constitutional law does appear to justify that denial, but we think it does so only by subordinating the defendant's constitutional rights to various other interests.

The premise of the Chief Judge's position is that the federal courts must treat the issue of *witness* exposure quite differently from prosecution staff exposure because a federal prosecutor can control only the latter. We think it is a mistaken premise because, as we have noted, it does not

---

**4.** We note that, if such instructions were a sufficient safeguard, there would be no need for the rule requiring a district court, at the request of a party, to exclude witnesses from the courtroom so that they cannot hear—and have their testimony shaped by—the testimony of other witnesses. *See* FED.R.EVID. 615.

**5.** We think that the dissent's analysis of the difficulty with the McFarlane testimony is flawed. That McFarlane changed his *congressional* testimony in response to North's immunized testimony implicates far more than his "credibility." Dissent on Pet. for Reh'g at 955

n. 3. It poses the crucial question whether the changed congressional testimony influenced, indeed, was reflected in his trial testimony. It is irrelevant whether McFarlane's testimony before the grand jury, given before the defendant's immunized testimony in front of Congress, was not *itself* inconsistent with McFarlane's testimony at trial. The issue is whether McFarlane testified at trial in such a way as to incorporate any of his *revised* testimony before Congress. In any event, we have before us only the district judge's assertion as to the comparison of the grand jury and trial testimony, not a finding based on record evidence.

matter to a defendant if his immunized testimony is used against him by a key witness (and his lawyer) rather than by the prosecutor. The damage to the defendant—which is the focus of *Kastigar*—is the same in either case.

In any event, although it is not an insignificant problem, we think the dissent exaggerates a prosecutor's difficulties. We can think of a number of ways that a federal prosecutor could seek to prevent exposure of witnesses he or she may intend to use, and even more ways to memorialize a witness' testimony before exposure. The dissent is apparently concerned about a witness *hostile* to the prosecution who deliberately exposes himself to the immunized testimony *in order to destroy the value* of his testimony. There is, of course, not a shred of evidence that the IC encountered this problem in this case. Indeed, only the Chief Judge raises this problem—not the IC and not the district judge. If a prosecutor had such a concern about a particular witness, that witness would be at the very top of the list of those whose testimony should be prerecorded. And if at a *Kastigar* hearing such a witness should seek to undermine the case, the prosecutor would be entitled to bring out such a motivation in his examination of the witness.

Our dissenting colleague points also to the particular problem faced by an Independent Counsel whose investigation is targeted against one or more executive branch officials. She suggests that other officials in the executive branch who could be called as witnesses might seek to frustrate the conviction of a target by exposing themselves to immunized testimony. That is actually less of a problem than it would be for an ordinary United States attorney targeting a non-government official. Government officials are subject to greater restraints on their behavior than private individuals. The Ethics in Government Act requires the Department of Justice to cooperate with an Independent Counsel. *See* 28 U.S.C. § 594(d) (1988). Other executive departments are expected to cooperate with the Department of Justice, the chief law enforcement arm of the executive. Moreover, the IC presumably has the power to bring charges of obstruction of justice against anyone who attempts to sabotage the investigation. We are not aware that the Independent Counsel made any efforts to prevent government officials who were to testify or who had already testified from exposing themselves to immunized testimony. The IC's position, unlike the dissent's, seems to have been that the matter was irrelevant or perhaps, after the exposure of the key witness and his modification of his testimony, that the horse was out of the barn.

Finally, and perhaps at the heart of the dissent's concerns, is the argument that a straightforward application of *Kastigar* in cases where a witness testifies before Congress, after Congress grants immunity under section 6005, unduly restricts Congress' role in exposing wrongdoing in the nation—including wrongdoing in the executive branch. She even contends that witnesses who wished to frustrate prosecutors would "line up to testify before Congress[ ] in exchange for ... immunity." Dissent on Pet. for Reh'g at 953. We do not think Congress would be so naive as lightly to grant use immunity to such prospective defendants. Surely Congress does so only when its perception of the national interest justifies this extraordinary step. When Congress grants immunity before the prosecution has completed preparing its "case," the prosecutor, whoever that may be, can warn that the grant of immunity has its institutional costs; in this case, the IC indeed warned Congress that "any grant of use and derivative use immunity would create serious—and perhaps insurmountable—barriers to the prosecution of the immunized witness." Memorandum of the Independent Counsel Concerning Use Immunity 1 (Jan. 13, 1987) (Submitted to the Joint Congressional Iran/Contra Committees) (J.A. at 2502). The decision as to whether the national interest justifies that institutional cost in the enforcement of the criminal laws is, of course, a political one to be made by Congress. Once made, however, that cost cannot be paid in the coin of a defendant's constitutional rights. That is simply not the way our system works. The

political needs of the majority, or Congress, or the President never, never, never, should trump an individual's explicit constitutional protections. Indeed, the government may not even use immunized testimony to prevent a defendant's subsequent perjury. *See New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979) ("Testimony given in response to a grant of legislative immunity is the essence of coerced testimony.... [In the case of immunized testimony,] we deal with the constitutional privilege against compulsory self-incrimination in its most pristine form. Balancing, therefore, is not simply unnecessary. It is impermissible.").[6]

The Chief Judge tentatively suggests a *post hoc* doctrinal justification for the district court's breach of the *Kastigar* "any use" wall, but, in doing so, we think she muddles two distinct concepts: (1) how one traces a causal connection between immunized testimony and grand jury or trial testimony to determine whether there is in fact "use," and (2) who, if anyone, may "use" immunized testimony against a defendant. Of course, a ban on any use of immunized testimony requires the prosecution to prove

that proffered evidence, which does not appear on its face to be drawn from immunized testimony, is not "directly *or indirectly* derived from such testimony." 18 U.S.C. § 6002 (1988) (emphasis added). And that process also, of course, is focused on the presence or absence of causal links between the immunized testimony and the proffered testimony. That is a factual inquiry; indeed, it is the central purpose of a *Kastigar* hearing. In our case, for instance, the district judge might find that a particular witness' exposure to immunized testimony was so peripheral—let us say he only saw a newspaper headline—that the judge could safely find that the witness' testimony was not tainted by the exposure, and therefore there is, in that situation, *no* use of the immunized testimony against the defendant. It is in that context that prior Fourth Amendment and Fifth Amendment cases on causation discussed under the rubric "fruit of a poisonous tree" are arguably relevant.[7] As should be quite apparent, however, the exploration of these causation issues demands a *Kastigar* hearing. Instead, the dissent asks us to permit the district court to wave a wand of benedic-

---

**6.** Contrary to our colleague's assertion that use immunity "exists in a delicate tension with the Fifth Amendment," and her accusation that we have "upset this tension," Dissent on Pet. for Reh'g at 951, the Fifth Amendment defines the parameters and limits the scope of any form of statutory immunity. The Supreme Court framed the issue of the constitutionality of 18 U.S.C. § 6002 in precisely these terms: "The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under this statute is coextensive with the scope of the privilege." *Kastigar*, 406 U.S. at 449, 92 S.Ct. at 1659 (footnote omitted). The Court upheld the constitutionality of the use immunity statute only because the statute was construed as providing "substantial protection, commensurate with that resulting from invoking the privilege itself." *Id.* at 461, 92 S.Ct. at 1665.

**7.** The fruit of the poisonous tree metaphor is actually backwards as applied to a *Kastigar* problem. The "tree"—the immunized testimony—is not poisonous; it is perfectly legal and only turns poisonous when used against the defendant. This suggests that the causation analysis will prove to be somewhat different in an immunity case than in determining whether evidence is a fruit of a Fourth or Fifth Amend-

ment violation. *See, e.g., United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir.1976). For instance, all the cases cited by the Chief Judge involve situations where an "independent act of free will" by the defendant (a voluntary confession by which the defendant waived his Fifth Amendment privilege) broke the chain of causation leading from a constitutional violation. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 280, 103 S.Ct. 608, 625, 74 L.Ed.2d 430 (1983) (Blackmun, J., concurring in the judgment); *see also United States v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398–99, 91 L.Ed. 1654 (1947). This analysis obviously has little applicability in the typical immunity case, where the defendant asserts his Fifth Amendment privilege at every opportunity and commits no independent, intervening act that breaks the chain leading from his compelled testimony to any use of it before the grand jury or at trial. And, of course, this focus on subsequent, voluntary waiver is not the same as saying, as the dissent claims, that the link between the constitutional violation and the evidence is too elongated or circuitous to be constitutionally relevant. *Cf. United States v. Crews*, 445 U.S. 463, 471, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980).

tion over boxes of documents and proclaim a factual finding. But absolutely nothing in the Chief Judge's discussion of Fourth and Fifth Amendment causation cases provides support for assuming non-causation as a matter of law or for affirming on appeal findings made or implied without a hearing, on the mere supposition that these actual or implicit findings must have been based on the totality of the evidence before the district judge.

In any event, causation is not the central issue in this case, and therein lies the Chief Judge's muddle. It would seem that witnesses who appeared before the grand jury and trial jury actually studied North's testimony. It is hard to imagine a more *direct* use of immunized testimony than in such a situation, and therefore the dissent's use of the phrase "attenuated use" seems quite inappropriate. We take it that the Chief Judge means to imply that such direct use is somehow "attenuated" if it does not bear the prosecutor's fingerprints, but that is simply another way of putting her main argument, that *Kastigar*'s protection can be easily evaded so long as an actor, independent of the prosecutor, does the damage to the defendant. None of the cases cited and discussed by the Chief Judge provides a shred of support for that proposition.

## II. Immunized Testimony Before the Grand Jury

The IC renews its argument that presentation of immunized testimony to the grand jury is permissible and that *no* inquiry into whether the grand jury considered evi-

dence based upon North's congressional testimony is therefore appropriate. The IC cites a long line of cases from both the Supreme Court and this court as having decided that a "defendant who has been compelled to incriminate himself" is entitled only to have that evidence suppressed at trial and not to have it excluded from consideration by the grand jury. Pet. for Reh'g at 10 & n. 9. But the IC fails to note that we have previously held that the grand jury may not consider immunized testimony or evidence derived from it. *See Rinaldi*, 808 F.2d at 1582–83. We therefore adhere to our original disposition; however, because neither our original opinion nor our opinion in *Rinaldi* discussed the line of authority now relied upon by the IC, we offer the following additional thoughts.

Under the IC's view, these cases stand for the proposition that a prosecutor could, consistent with *Kastigar*, read compelled testimony verbatim to the grand jury. All of the cases the IC cites, however, involve the presentation to the grand jury of evidence *previously* obtained in violation of a defendant's privilege against self-incrimination;[8] none involves grand jury consideration of testimony obtained from the defendant through a grant of immunity. The IC thus continues to miss the fundamental distinction between the presentation to the grand jury of evidence that has previously been unconstitutionally obtained and that of constitutionally-obtained evidence whose exposure to the grand jury amounts to a constitutional violation in and of itself.

8. *See, e.g., United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) (incriminating evidence previously filed by the defendant in a tax deficiency proceeding before the Tax Court could be considered by a grand jury investigating related criminal tax evasion charges "[e]ven if we assume that the Government did acquire [the] evidence in violation of the Fifth Amendment"); *Lawn v. United States*, 355 U.S. 339, 345–50, 78 S.Ct. 311, 315–18, 2 L.Ed.2d 321 (1958) (incriminating evidence obtained from a defendant who had not been apprised of his Fifth Amendment rights could be considered by a subsequent grand jury); *Holt v. United States*, 218 U.S. 245, 247–48, 31 S.Ct. 2, 4–5, 54 L.Ed. 1021 (1910) (coerced or "incompetent" confession could be considered by a grand

jury); *see also Midland Asphalt Corp. v. United States*, 489 U.S. 794, 800, 109 S.Ct. 1494, 1499, 103 L.Ed.2d 879 (1989) (citing *Lawn, supra*, for the proposition that "we have held that even the grand jury's violation of the defendant's right against self-incrimination does not trigger the Grand Jury Clause's 'right not to be tried'"); *In re Sealed Case*, 877 F.2d 976, 981–82 (D.C.Cir. 1989) (evidence obtained by the government in violation of the defendant's attorney-client privilege could be considered by the grand jury); *Laughlin v. United States*, 385 F.2d 287, 291 (D.C.Cir.1967), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968) (conversation recorded in violation of the Fourth Amendment could be presented to the grand jury).

As we recently recognized, "[g]rand jury inquiries grounded on information obtained in violation of a constitutional provision do not themselves work an additional wrong; they 'are only a derivative use of the product of a past unlawful [action].'" *In re Sealed Case*, 877 F.2d 976, 982 (D.C.Cir. 1989) (quoting *United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974)). And "[w]hether such derivative use of illegally obtained evidence by a grand jury should be proscribed presents a question, not of rights, but of remedies." *Calandra*, 414 U.S. at 354, 94 S.Ct. at 623. By contrast, the grand jury and the grand jury process may never "itself violate a valid privilege"; such action presents a question not of remedies but of *rights. Id.* at 346, 94 S.Ct. at 619 ("Although ... an indictment based on evidence obtained in violation of defendant's Fifth Amendment privilege is nevertheless valid [citation omitted], the grand jury may not force a witness to answer questions in violation of that constitutional guarantee.").

 We believe—as do five of our sister circuits, *see* Maj.Op. at 869–870—that grand jury consideration of evidence already unconstitutionally compelled and grand jury consideration of immunized testimony fall on different sides of this fence. In the former context, such as where *Miranda* warnings are not given, the constitutional violation occurs independent of the grand jury. Whether the resulting confession can be used derivatively by the grand jury or in subsequent proceedings is a matter of the reach of the exclusionary rule, which is a function not of any rights of the defendant but of a remedial balance factoring in the possible unreliability of the confession and the need to deter the government from future violations of Fifth Amendment rights. *See, e.g., Oregon v. Elstad*, 470 U.S. 298, 304–08, 105 S.Ct. 1285, 1290–93, 84 L.Ed.2d 222 (1985); *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker*, 417 U.S. 433, 445–47, 94 S.Ct. 2357, 2364–65, 41 L.Ed.2d 182 (1974). The exclusionary rule is, of course, by no means talismanic—where the goals

of trustworthiness and deterrence are not implicated, the confession may be used. For example, a confession obtained in violation of *Miranda* may (provided it is trustworthy) be used to impeach the defendant's contrary testimony at trial because "sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Harris v. New York*, 401 U.S. 222, 224–25, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971). The cases cited by the IC thus reflect only the familiar proposition that, while evidence obtained previously in violation of the defendant's Fifth Amendment privilege may not be used by the prosecution in its case in chief at trial, it may be used for other purposes, including grand jury proceedings.

In contrast, as the Supreme Court has recognized, use of immunized testimony is never justified by such balancing considerations. *See Portash*, 440 U.S. at 459, 99 S.Ct. at 1297. The prosecution obtains the immunized testimony legally, but only by promising that neither the testimony or information itself nor any information directly or indirectly derived from it will "be used against [the defendant] in any criminal case." 18 U.S.C. § 6002. And it is only this promise that compels the defendant to testify in spite of his constitutional privilege: "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination. . . . [because i]t prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis in original). When the prosecution reneges on this constitutionally-mandated bargain and presents the immunized testimony to the grand jury, the constitutional violation is part and parcel of the grand jury process. The presentation—"use"—of the testimony is precisely the proscribed act. The issue is thus not one of "derivative use ... by the grand jury" and of the exclusionary rule (indeed, any use of the testimony is *per se* excluded under the statute and *Kastigar*). Rather, the situation is no different than if the grand jury had itself forced the defen-

dant to give incriminating answers and any indictment based upon immunized evidence is no less tainted.[9]

## III. Count 9 Authorization Instructions

■ The IC is barred from arguing that we erred in construing 18 U.S.C. § 2071(b) to require that a defendant possess "knowledge of unlawfulness." Maj.Op. at 886. Despite its current protestations to the contrary, the IC never made, and thus waived, this argument. At no point in its brief did the IC dispute North's contention that "knowledge of unlawfulness" is a required element of this statute. North's reply brief emphasized that knowledge of unlawfulness meant actual knowledge, citing two cases in support—including *United States v. Cullen*, 454 F.2d 386 (7th Cir.1971), on which the IC now relies.[10] As a result, at oral argument both the court and North's counsel understood the question to be uncontested. The following dialogue took place during the opening argument of North's counsel.

> QUESTION: Wait a minute. Knowledge of unlawfulness, it is agreed by both parties, is required under Count 9, not under Count 6. Is that correct?
>
> MR. SIMON: That's correct, Your Honor, and in pointing out problems with the counts, there is no problem. It is absolutely clear that Count 9, the other count that I did want to address briefly, Count 9, those instructions clearly require reversal as to Count 9, because the instruc-

tions are undisputed that the law requires knowledge of unlawfulness. Tr. at 37. If the IC had remained silent on this issue at oral argument we would surely have been entitled to assume that it had waived the contention it now raises, but the IC, in response, expressly conceded the point.

> QUESTION: I am inclined to think you are correct that [Count 6] does not require knowledge of unlawfulness, *as Count 9 does and you concede.* And I think you say in your brief, and I think you are correct, that it requires at least knowledge of wrongfulness. Is that correct?
>
> MR. LYNCH: Yes.

Tr. at 73 (emphasis added).[11]

The revisionist nature of the IC's current claim is further illustrated by its new found reliance in its petition for rehearing on dictum in *Cullen*, 454 F.2d at 392, which, according to the IC, conflicts with our view of the requisite *mens rea.* The IC did not cite *Cullen* in its brief or mention it at argument, as it surely would have done had it meant to raise the point it now argues. Thus, the IC never asserted in these extensive proceedings—until its petition for rehearing—that the test of 18 U.S.C. § 2071(b), the statutory section alleged to be violated in Count 9, could be satisfied by the government if it showed that a defendant *should* have known, in accordance with an objective test, that his conduct was unlawful. Indeed, Chief Judge Wald, who dissented from our origi-

9. Of course, to be entitled to a hearing on whether immunized testimony was before the grand jury, a defendant must lay a firm "foundation" resting on more than "suspicion" that this may in fact have happened. *Cf. Lawn*, 355 U.S. at 348–49, 78 S.Ct. at 317–18. In light of the district court's finding that grand jury witnesses were exposed to his immunized testimony, *see* Maj. Op. at 866–867, North has clearly met this burden.

10. *Cullen*'s holding, as opposed to its *dicta*, supports North. In discussing the jury instructions, the Seventh Circuit observed that "[t]he Government recognizes, and the judge's instructions plainly stated, that knowledge of illegality was an element of each of the offenses committed by appellant." *Cullen*, 454 F.2d at 391. The assertion upon which the IC relies—that convic-

tion could be sustained if the defendant "reasonably should have known" that his conduct is wrongful, *id.* at 392—comes as *dictum* because Cullen knew that he was breaking the law.

11. On occasion counsel can be "momentarily caught off guard by the court's vigorous questioning," *Church of Scientology v. IRS*, 792 F.2d 153, 171 n. 10 (D.C.Cir.1986) (*en banc*) (Silberman, J., concurring), *aff'd*, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987), but we are quite certain that it did not happen in this case. Mr. Lynch, who is as able an appellate advocate as we have ever observed, seems to us to have known precisely what he was saying. And we doubt that Mr. Lynch, whose name does not appear on the petition for rehearing, would expect any special solicitude from this court.

nal opinion, did not then dispute our characterization of the IC's argument as having agreed (or conceded) that actual knowledge of unlawfulness was required under Count 9. *Compare* Maj.Op. at 884–886 *with* Diss.Op. at 929, 930–932.

To be sure, Judge Ruth B. Ginsburg, dissenting from the denial of rehearing *en banc* on this Count alone, asserts that, notwithstanding all of the above, the IC did preserve in its brief the argument it now makes. She quotes from page 39 of the IC's brief: "But an unreasonable belief that an order to lie to Congress or alter official records made such conduct legal no more negates guilt than would an unreasonable belief that the conduct itself had not been prohibited." The difficulty with this sentence, however, which is not specifically directed at Count 9, is that the *same conduct* was also alleged in Count 6 as violating § 1505 and the IC did argue that it was not obliged to prove knowledge of unlawfulness as to Count 6. At *no point* in the IC's brief does the IC claim that it was *not* required to prove actual knowledge of unlawfulness to make out the violation of § 2071, charged in Count 9. The closest the IC comes to that argument is its carefully crafted footnote 73 in which it claims that "North cites no case holding that the state of mind required for violation of either § 1505 or § 2071 is precluded by an unreasonable belief that the conduct was authorized." We note that the sentence purposefully does not affirmatively argue the contrary. Authorization, moreover, is not necessarily the equivalent of lawfulness. The petition for rehearing clearly makes the new and broader argument that even if North believed (reasonably or not) that his conduct was authorized, he can still be convicted under Count 9—requiring the government to prove knowledge of unlawfulness—if his reliance on authorization to avoid illegality was unreasonable. The IC's brief avoided any analysis of the mental state required under § 2071; footnote 73 glosses over that issue, eliding it with the mental state required by § 1505.

In short, Judge Ruth B. Ginsburg's differing reading notwithstanding, it appears to us that for whatever reason (perhaps the lack of any supporting authority), the IC deliberately chose not to make the argument it now raises for the first time. We therefore believe that the IC's contention upon which it rests its petition for rehearing—that the panel "[e]rroneously claim[ed] that the Government agreed that ... 18 U.S.C. § 2071(b) 'requires *subjective* knowledge of unlawfulness for conviction,'" Pet. for Reh'g at 12 (quoting Maj.Op. at 886)—is a misstatement. In any event, we cannot imagine that this issue is *en banc* worthy in accordance with any of the principles that govern such determinations. We disagree with Judge Ruth B. Ginsburg's characterization of our reasoning in the case that was before us, which, after all, relies in part on a prior decision of this court. *See United States v. Rhone*, 864 F.2d 832, 835 (D.C.Cir.1989). The petition for rehearing, however, is based, not on a disagreement with the reasoning we employed in the case we decided, but rather on the new theory, previously disavowed, presented in the petition. Although we decline to entertain this revisionist argument at this late stage in the proceeding (whatever its merit or lack thereof), we do not see how the government (or the IC) could be barred from raising the argument in another case. So, on the assumption that the IC should not be treated any differently from other litigants before the court, we do not understand how it can be thought that its new claim is *en banc* worthy.

## IV. Jury Unanimity Instruction

■ As to the IC's final point—that no specific unanimity instruction was required as to Count 9—upon reviewing the petition, the response of North, and the instructions of the district court to the jury, we conclude that this point is well taken. This Count of the indictment "charged that North, having custody of NSC documents, 'willfully and knowingly' did conceal, remove, mutilate, obliterate, falsify and destroy and did cause to be concealed, removed, mutilated, obliterated, falsified and destroyed records, papers and documents

filed and deposited in a public office ....'" *United States v. North,* Maj.Op. at 876, quoting Joint Appendix at 260–61. As originally conceived, Count 9 concerned North's handling of at least three groups of documents in several distinct incidents. At the time of the issuance of our original opinion, both the majority opinion (Maj.Op. at 876–877) and the dissent (Dissent at 925) failed to note that the district court had instructed the jury to limit its consideration to a single incident involving five specific documents. Therefore, each opinion dealt with the question as if all documents and incidents originally charged in the indictment were still before the jury.

The IC in his motion for reconsideration called our attention to the trial court's limiting instruction. We now review the instruction including the limitation under the principle that these instructions must be considered "as a whole." *United States v. Mangieri,* 694 F.2d 1270, 1280 (D.C.Cir. 1982). Having done so, we conclude that the instructions on Count 9 as a whole did not pose "a genuine risk that the jury [would be] confused." *United States v. Duncan,* 850 F.2d 1104, 1114 (6th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 732, 107 L.Ed.2d 751 (1990). As the IC argues in his petition for rehearing, "[t]he evidence was identical as to all five documents ... [t]hus, the jury was restricted to *one* continuous course of events. *United States v. North,* 716 F.Supp. 644, 649 (D.D. C.1989)." Thus, the omission of a specific unanimity instruction did not constitute reversible error. We will therefore allow the petition of the Independent Counsel to this limited extent, and withdraw Section II of our prior opinion herein.

WALD, Chief Judge, dissenting as to Parts I, II, & III:

In his petition for rehearing, the Independent Counsel ("IC") argues that the prohibitions of the use-immunity statute, 18 U.S.C. § 6002, do not extend to the government's use of witnesses who have independently exposed themselves to immunized testimony. Although the claim that the statute does not cover any such witness exposure is problematical, I do agree, as

my earlier dissent reflects, that the statute does not require that independent witness exposure and prosecutorial exposure be treated identically for prophylactic purposes. Since, as the IC's petition forcefully points out, my colleagues' original opinion effectively transformed a limited use immunity into a sweeping transaction immunity, I would grant the IC's petition for rehearing on the *Kastigar* issue. By exalting form over substance, the original *per curiam* eviscerates both the use-immunity and independent-counsel statutes; its consequences for future cases of public import are ominous.

### I. *Kastigar* REQUIREMENTS

#### A. The Problem with the Original Opinion

The Supreme Court has recognized that use immunity is coextensive with the fifth amendment privilege. Accordingly, restrictions on the use of immunized testimony are exacting.

> [T]he prosecution [bears] the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972).

This "very substantial protection," *id.* at 461, 92 S.Ct. at 1665, while reflecting the importance of the constitutional values at stake, was not meant to make the prosecution's burden an impossible one. The use-immunity statute makes a precise accommodation between the privilege against self-incrimination and the public's legitimate interest in securing testimony; use immunity thus exists in a delicate tension with the fifth amendment.

By mandating additional—and practically unattainable—requirements not found in *Kastigar* itself, my colleagues have upset this tension. They have rendered impossible in virtually all cases the prosecution of persons whose immunized testimony is of such national significance as to be the subject of congressional hearings and media

coverage. In their opinions, my colleagues have ruled that *Kastigar* requires at least *four* distinct showings, only the first two of which can be derived from *Kastigar* itself. First, the prosecutors must demonstrate that they avoided "significant exposure" to the immunized testimony. Majority Opinion ("Maj. op.") at 859. Second, the prosecution must demonstrate that its identification and questioning of witnesses was based solely on "independent leads"—without the use of immunized testimony. Maj. op. at 863. Third—a new requirement, appearing for the first time in the opinion denying rehearing—the prosecution must demonstrate that the immunized testimony did not *"motivate[ ]"* its witnesses to testify. Opinion on Petition for Rehearing at 942. And fourth, the prosecution must demonstrate that the testimony of witnesses "exposed" to immunized matter has been " 'canned' by the prosecution before such exposure." Maj. op. at 872.

The last and most stringent of these requirements—that witness testimony be pre-recorded—is certainly an unwarranted departure from current law. For this reason, it deserves quotation at some length.

> [T]he District Court must hold a full *Kastigar* hearing that will inquire into the *content* as well as the *sources* of the grand jury and trial witnesses' testimony. That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item. For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the Office of Independent Counsel in questioning the witness. *This burden may be met by establishing that the witness was never exposed to North's immunized testimony, or that the allegedly tainted testimony contains no evidence not*

> *"canned" by the prosecution before such exposure occurred.*

Maj. op. at 872–873 (latter emphasis supplied). Although my colleagues now maintain that they did not intend to rule that pre-recording was the *only* way the prosecution could demonstrate that the testimony of a witness exposed to immunized testimony was admissible, the words of the *per curiam* are clear: either can the witness or can his testimony.[1]

My colleagues invoke *United States v. Rinaldi*, 808 F.2d 1579 (D.C.Cir.1987), to support that radical extension of current law. Yet *Rinaldi* does not even suggest that the witness' original knowledge need be or was pre-recorded. Instead, the *Rinaldi* court indicated a far more lenient rule of inevitable discovery—the prosecution need only show that "the police *would* inevitably have learned the [facts] from [the witness]." 808 F.2d at 1583 (emphasis supplied). As set forth in my original dissent and outlined below, I believe that Judge Gesell's findings clearly established such inevitable discovery. *See* Dissenting Opinion ("Diss. op.") at 917, 922–923.

My colleagues' extension of *Kastigar* is infirm not only because, as the IC suggests, it is unrooted in existing law, but also because it effectively emasculates both use immunity and the Office of the Independent Counsel.

A uniform requirement of pre-recording witness knowledge in exquisite detail is unworkable. As even the greenest trial lawyer knows, the accrual of evidence is interactive—the statements of one witness often suggest new questions for earlier witnesses. Pre-recording of every line of every witness' trial testimony in every prosecution in which a defendant might publicly offer immunized testimony would ultimately prove unfeasible.

The consequences of a pre-recording requirement are both predictable and troubling. Prospective targets of grand juries

---

1. My colleagues' revised standard offers precious little guidance to the court below on remand, or to trial courts generally. It is not enough to note that "it may well be extremely difficult for the prosecutor to sustain its burden" and that this court "did not mean to pre-clude the use of any techniques of which we are not aware." In reversing the court below, it is this court's obligation to offer meaningful and workable guidelines to that court on remand, as well as to future courts in similar situations.

in national scandals would line up to testify before Congress, in exchange for what is effectively transaction immunity. A requirement of "nonuse" would be converted into a guarantee of nonprosecution. Moreover, as the IC notes, with regard to crimes involving government corruption, the IC and Congress have *parallel* responsibilities. Petition at n. 1. A pre-recording requirement compels Congress to delay congressional hearings until all of the testimony of all potential witnesses has been pre-recorded; in doing so, this requirement unduly burdens Congress' exercise of its legitimate authority to hold important public hearings.

The Supreme Court has said that use immunity "grants neither pardon nor amnesty." *Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665. But the majority's excruciatingly heightened *Kastigar* requirements run counter to Congress' express assertion that "the [use-immunity] provision is not an 'immunity bath.'" H.Rep. No. 91–1188, 91st Cong., 2d Sess. at 12 (1970) (citing *United States v. Monia*, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943)).

The interpretation of *Kastigar* offered in the original *per curiam* opinion also conflicts with the congressionally-bestowed responsibilities of the IC. Congress created the IC Office pursuant to its Article II authority "to enact laws to guard against *the evils of massive conflicts of interest involved in the enforcement of federal criminal law against the highest officials of government.*" *In re Olson*, 818 F.2d 34, 43 (D.C.Cir.Indep.Couns.Div.1987) (emphasis in original). Congress acted on the basis of

> fifty years of the nation's history involving the Teapot Dome, Truman Administration, and Watergate scandals [which] demonstrated a generally recognized inability of the Department of Justice and the Attorney General to function impartially with full public confidence in investigating criminal wrongdoing of high-ranking government officials....

818 F.2d at 42. Accordingly, the IC Office serves a critical role in our constitutional system of checks and balances. *See gener-*

*ally Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). It safeguards the primary precondition for government under law: that no one sit in judgment of his or her own case.

My colleagues' extension of *Kastigar* thwarts Congress' central purpose in creating the Office of the IC. Congress required the appointed counsel to be truly *independent* and its authority exclusive; Congress thus required that "the Department of Justice, the Attorney General, and all other officers and employees of the Department ... suspend all investigations and proceedings" on matters within the IC's jurisdiction. 28 U.S.C. § 597. Yet in its expansive interpretation of *Kastigar*, the majority provides an easy out for conflicted government officials; they can immunize *their colleagues* from prosecution by exposing *themselves* to immunized testimony. In this case it was insiders—high government officials—who "soaked" themselves in North's immunized testimony. To raise an insurmountable bar against the admission of the testimony of these officials, however necessary it might be to the prosecution, critically undermines the authority and independence of the IC in cases of self-defined conflict on the part of government officials.

The majority is correct in noting that, if *Kastigar* is read only to apply to exposure of *prosecutors*, then "a private lawyer for a witness sympathetic to the government could listen to the compelled testimony and use it to prepare the witness." Opinion on Petition for Rehearing at 942. But it is also true that if *Kastigar* is read to require pre-recording of all government-witness testimony, then a witness *hostile* to the government could "listen to the compelled testimony and use it" to insulate himself from testifying.

There must be a middle ground, and I believe the case should be reheard (by the panel or *en banc*) to find it. The significance of these issues for the prosecution of future governmental scandals and for the effective functioning of separation of powers is too great to let the overreach of the

original opinion (or my colleagues' undefined backtracking) stand.

## B. *Prosecutorial Exposure v. Independent Witness Exposure*

No prior decision has articulated the proceedings *Kastigar* requires in cases involving widely disseminated immunized testimony. The trial judge here labored in uncharted territory. In cases like North's several goals and values must be accommodated: the immunized person's fifth amendment privilege; Congress' purposes in enacting the use-immunity statute; the function and integrity of the Office of the IC; and the government's need for workable guidelines.

As the IC's petition highlights, the central conceptual weakness of the majority's analysis is its failure to recognize that a prosecutor's exposure to immunized testimony and a witness' independent exposure to such testimony raise related but distinct issues. By holding to the same standard witnesses who have "thoroughly soaked" themselves in immunized testimony and prosecutors who have assiduously avoided the slightest taint, the majority renders virtually impossible any prosecution of an immunized defendant who testifies publicly.

Prosecutorial use of immunized testimony is the paradigmatic violation of the use-immunity statute and prosecutorial exposure is, thus, at the heart of use immunity. Indeed, as the IC's petition points out, virtually every prior case concerning use immunity involved prosecutorial knowledge of immunized testimony. We all agree that prosecutors must avoid "significant exposure" to immunized testimony, develop independent leads to witnesses, and refrain from using immunized testimony to lead or coach those witnesses. In this regard, the prosecution bears the continuous and uninterrupted burden of persuasion, and in this case, no one disputes that the IC has met that burden. Maj. op. at 859; Diss. op. at 921.

Independent witness exposure poses a different problem. Despite the prosecution's diligent, and often extraordinary, prophylactic measures, witnesses may, for a variety of reasons, "soak" themselves or be soaked by others in immunized testimony. For such witnesses, the prosecutor's burden to show nonuse should arguably be quite different. Initially, the prosecutor must establish a *prima facie* case that a witness' testimony does not constitute a prohibited "use." This initial burden should, however, be met, as it was in the North case, by a five-factored showing:

(i) the prosecution must demonstrate that the identification of witnesses was wholly independent from immunized testimony;

(ii) the prosecution must demonstrate that the questions it directs to witnesses are wholly independent from immunized testimony;

(iii) at any grand jury proceedings, the prosecution must direct witnesses to base their answers solely on personal knowledge;

(iv) at trial, the judge must similarly instruct witnesses; and

(v) before the trial begins, the prosecution must deliver to the defense all recorded statements of witnesses, including grand jury testimony and any other interviews or statements.[2]

Collectively, these requirements should be sufficient to establish a *prima facie* case that any testimony offered at trial by the IC is untainted.

Upon establishment of a *prima facie* case, the defense then bears a burden to produce some specific evidence that the testimony—either in source or content—is tainted; upon such production, the court is required to hold a hearing on the alleged taint. The defense need only produce specific, not conclusive evidence, for as *Kasti-*

---

2. Some material—such as preliminary interviews and nontestimonial grand jury proceedings—were delivered to the defendants after trial. *Joint Appendix ("J.A.") at 591.* Ideally these materials should have been available before trial. Nonetheless, the defense, equipped with all of these materials, has not identified any specific incidence of—or indication of—tainted testimony.

*gar* suggests, the prosecution always bears the burden of ultimate persuasion. Specific evidence might include a pattern of recollection or specificity that suggests taint, or contradictions between recorded and unrecorded testimony. As the Supreme Court stated in another allocation-of-burdens context, "[i]t is sufficient [that] the defendant's evidence raises a genuine issue of fact" as to whether the witness' testimony is tainted. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

This allocation of burdens would be one way to reconcile the several constitutional values and statutory commands implicated by prosecutions like North's. As the Supreme Court has noted

> This burden-shifting principle is not new or novel. There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, "is merely a question of policy and fairness based on experience in the different situations."

*Keyes v. School District No. 1*, 413 U.S. 189, 209, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973) (citations omitted).

Whether or not the best resolution of these values lies in burden shifting, the important thing is that the use-immunity statute be construed so as to accommodate the real difference between prosecutorial exposure and use—the central danger posed by use immunity—and witness exposure, which is more diffuse and beyond the immediate control of the prosecution. Respecting this critical difference, this court should seek to provide a workable and attainable standard that guarantees the integrity of use immunity while allowing for a cautious and untainted prosecution.

## C. Kastigar *Proceedings in This Case*

My earlier dissent cataloged the thorough, if tedious, *Kastigar* procedures employed by the trial court. Diss. op. at 914–917. These efforts—unrebutted by any showing of taint by the defense—ensured that there was no "use" of North's immunized testimony and thus no reversible error.

> The trial court clearly and correctly found that the IC office fully insulated itself from exposure to immunized testimony.
> The content of the testimony of all but one of the relevant grand jury witnesses was "canned" before North testified—and the testimony of that witness was cumulative with other canned testimony. The court's "preliminary" *Kastigar* finding—analogous to the *prima facie* showing suggested above—was based on a thorough reading of preliminary witness interviews and the grand jury record.[3] The trial court precisely and cautiously instructed trial witnesses to testify based solely on personal knowledge; indeed, the court instructed that any doubt should be resolved in favor of *not* testifying.[4]

---

**3.** Although my colleagues maintain that the testimony of Robert McFarlane lies "at the core of this dispute," I do not understand how. My colleagues suggest that McFarlane "changed his testimony before Congress after hearing the immunized testimony, and then presumably told the modified version to the trial jury." Opinion on Petition for Rehearing at 944.

The majority's argument is flawed in two ways. First, that McFarlane changed his *congressional* testimony implicates his credibility but says nothing about the consistency of his grand jury and trial testimonies. Second, Judge Gesell was thoroughly familiar with the grand jury testimony, J.A. at 316–44, and thus would have noted any inconsistency between McFarlane's grand jury and trial testimonies. No one has noted any such divergence—and not for lack of opportunity. Equipped with McFarlane's grand jury testimony, the defense was capable of identifying any inconsistency at trial, in its post-trial motion, in its appeal brief, in its reply brief, at oral argument, or in its response to the petition for rehearing. It failed to do so at every turn. From this scenario, the trial judge rightly concluded that McFarlane's testimony—given pursuant to a strict judicial instruction that his testimony be based solely on his personal knowledge, *see* note 4 *infra*—was not tainted by North's immunized testimony.

**4.** The wording of this judicial admonition—delivered individually to each witness—is worth quoting.

> Before we get started, [name of witness], I want to be sure you understand the rules under which we are operating here. You are not to testify to any matter, except for matters you know of your own personal knowledge.

Based on knowledge of the preliminary interviews and grand jury testimony, the court was able to determine that no tainted testimony was introduced at trial.

The IC delivered relevant grand jury testimony to the defense, enabling the latter to challenge any testimony as tainted.

Upon consideration of North's post-trial motion for a second *Kastigar* hearing—analogous to the burden of production suggested above—the court found "few new issues" and "no new information" suggesting taint, and, accordingly, denied the motion.

Taken together, all of these procedural protections and the continued diligence of the trial court made clear that no testimony was tainted by North's immunized testimony and thus that no illegal "use" of immunized testimony was made. The majority's remand for a "line-by-line" re-examination of the source (and perhaps the motivation) of the testimony of every prosecution witness and its mandate that the prosecution prove—by pre-testimony canning or some undefined functional equivalent—that all testimony was untainted represents an unneeded and unprecedented incursion into the trial court's discretion in managing a fair trial.[5]

## II. CONSTITUTIONAL QUESTIONS

To hear my colleagues tell it, the *Kastigar* analysis I have outlined "lessen[s]" and "subordinat[es North's] constitutional rights." The majority reasons that because use immunity is "coextensive" with the scope of the fifth amendment privilege,

> You are not to testify to anything that you learned because you heard, read or listened to any portion of Col. North's testimony up before the Iran–Contra proceeding. And if you are asked a question and you don't know in your own mind whether your answer is derived from his testimony or something you know independently, you are not to answer it. Do you follow me?
>
> J.A. at 1041; *see also* J.A. *passim.*

5. Needless to say, I take strong exception to my colleagues' characterization of the trial judge's proceedings as merely the "wav[ing of] a wand of benediction" and his conclusions of law as mere "assertions." I do not find such remarks apt, necessary, or helpful.

*Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661, any violation of the immunity statute is a violation of the Constitution. Assuming this is correct, and that it is the Constitution we are expounding, then we should begin by looking at relevant interpretations of what the fifth amendment requires.

Although in theory and rhetoric the fifth amendment privilege against self-incrimination is often cast as absolute, the bar on the admission of evidence acquired pursuant to [6] a fifth amendment violation is less than absolute.[7] Even though a confession is coerced, evidence secured pursuant to that confession will only be suppressed if it is deemed to be "fruit of the poisonous tree." *Harrison v. United States,* 392 U.S. 219, 222–24, 88 S.Ct. 2008, 2010–11, 20 L.Ed.2d 1047 (1968); *cf. Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "The exclusionary rule ... does not apply if the causal connection between the information obtained illegally and the proof offered by the prosecution has 'become so attenuated as to dissipate the taint.' " *United States v. Davis,* 617 F.2d 677, 688 (D.C.Cir.1979) (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980).

For example, the Supreme Court has recognized that a coerced first confession inevitably influences a second confession, but has ruled that the later confession is admissible if there is a " 'break in the stream of events ... sufficient to insulate' " the sec-

6. By "acquired pursuant to" I mean evidence whose acquisition is causally related—in some degree—to the constitutional violation.

7. Although my colleagues purport to distinguish between questions of causation and agency, they offer no constitutional basis for this distinction nor any statutory basis for its importation into the law of use immunity. The question of *who* may use tainted evidence, of course, rarely, if ever, arises in other kinds of fifth amendment cases; accordingly, my colleagues' suggestions are at best speculative.

ond confession from the first.[8] *Darwin v. Connecticut,* 391 U.S. 346, 349, 88 S.Ct. 1488, 1490, 20 L.Ed.2d 630 (1968) (quoting *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967)). In such rulings, the Court has *not* held that successive confessions are *not* causally related; indeed the Court has expressly indicated its recognition that they are.

> [A]fter an accused has once let the cat out of the bag by confessing, ... he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

*United States v. Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398–99, 91 L.Ed. 1654 (1947); *see also Davis,* 617 F.2d at 689.[9]

If evidence connected in some fashion to a fifth amendment violation may be admissible if its connection to the violation is sufficiently remote, and use immunity is coextensive with the fifth amendment privilege, then it would stand to reason that the exclusionary mandate of the use-immunity statute may also be limited as the proffered evidence becomes more and more re-mote from the original immunized statement. That is, at some point the link between the initial utterance (whether a coerced confession or immunized testimony) and the ultimate evidentiary "use" becomes so attenuated as to be constitutionally irrelevant. In such an eventuality, the government's burden of disproving taint would certainly be modified accordingly.[10]

Indeed this proposition is well supported in the legislative history of the use-immunity statute. Explaining § 6002's prohibition on the use of immunized testimony or "any information directly or indirectly *derived* from such testimony," Congress, citing *Wong Sun,* indicated that some "use" of immunized testimony may be so attenuated as to be outside the scope of the Constitution and the statute. H.Rep. No. 91–1188, 91st Cong., 2d Sess. 12 (1970). As Justice Blackmun has noted in concluding his review of the statute, "References to the 'fruits' doctrine are scattered throughout the legislative history." *Pillsbury Co. v. Conboy,* 459 U.S. 248, 277, 103 S.Ct. 608, 624, 74 L.Ed.2d 430 (1983) (Blackmun, J., concurring) (collecting authorities).

Thus the nexus of use immunity and the fifth amendment privilege raises many problematic issues. Perhaps, at some point, testimony by exposed witnesses is so far removed from the immunized source as to no longer be "fruit of the poisonous tree." Perhaps independent witness exposure is so tangentially related to the immunized

---

**8.** When a statement is obtained in violation of a defendant's *Miranda* rights, an even broader range of derived information is admissible. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *cf. United States v. Bengivenga,* 845 F.2d 593, 601 (5th Cir.) (holding that "a mere violation of *Miranda*'s 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine"), *cert. denied,* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988).

**9.** This line of cases seems to cast doubt on the majority's claim that the prosecution must always prove that immunized testimony did not *motivate* witnesses to testify. Opinion on Petition for Rehearing at 942. If a second confession motivated by a coerced first confession may be admissible because it is sufficiently removed from the coerced confession, then witness testimony "motivated" by immunized testimony may also be admissible because the causal connection between the two is too remote.

**10.** My colleagues' incantation that *Kastigar* prohibits "*any* use" of immunized testimony is at best unhelpful. First, in finding that use of immunized testimony constituted harmless error, courts do not hold that there was not *any* use—but rather that such use was not sufficiently prejudicial to warrant reversal. *See United States v. Serrano,* 870 F.2d 1, 16 (1st Cir.1989) (collecting authorities). Moreover, what is at issue in this case is not whether immunized testimony was used in obtaining North's conviction, but rather whether "any information directly or indirectly derived" from immunized testimony was used. 18 U.S.C. § 6002; *cf. United States v. Kurzer,* 534 F.2d 511, 515 (2d Cir. 1976). Congress did not address the issue of *derivation* with a simplistic "never, never, never" but instead invoked the "poisonous tree" rule of *Wong Sun.*

statement as to warrant the sort of evidentiary scheme I have outlined.[11]

I raise these points not to answer them, but to emphasize that we tread on virgin ground here. And, if as my colleagues maintain, this is *constitutional* territory, then there is all the more reason for the most careful consideration before we lay down absolute and intolerable burdens on the prosecution in a media-dominated age. My colleagues are certainly correct that "the political needs of the majority ...· never, never, never should trump an individual's explicit constitutional protection." But this is only to beg the question: How far does the fifth amendment's "explicit constitutional protection" extend? The question is a deep and unsettled one in current constitutional law. Our answer to date is unsatisfying and cries out for thoughtful reconsideration.

When all is said and done, the issue comes down to whether the Constitution requires that the trial judge conduct a full-scale hearing as to the source of every line of testimony emanating from any witness who has been exposed to immunized testimony, wholly independent of any action by the prosecutor, and even when the defense can provide no evidence whatsoever that the witness was influenced by the exposure. I conclude that such an absolute requirement is not self-evident from past interpretations of the fifth amendment. Indeed, the plethora of arguments about the scope of the *Kastigar* requirements spawned in my colleagues' *North I* and *II*

opinions only underscores the uncertain legal basis of the original decision.

### III. AUTHORIZATION AND INTENT

The IC also challenges the *per curiam* holding that 18 U.S.C. § 2071(b) "requires *subjective* knowledge of unlawfulness for conviction."[12] Maj. op. at 886 (emphasis in original). As the IC suggests, it seems difficult to reconcile this requirement with the majority's express rejection of the infamous "Nuremberg defense" that "following orders ... can transform an illegal act into a legal one." Maj. op. at 881. Indeed, I can think of no way to harmonize the rejection of the "following-orders" defense with the claim that a jury may acquit a defendant who relied on an admittedly unreasonable belief that he was "authorized" to commit what he otherwise knew was an unlawful act. Unfortunately, this novel holding has broad implications; as the petition notes, twenty-six federal criminal statutes contain wording similar to that in 18 U.S.C. § 2071(b). Petition at 13. Under any one of them, a defendant can now be found to lack the requisite intent, even though he knew an act was otherwise unlawful, if he unreasonably relied on a vague instruction from a superior official. This cannot be the law and the majority's ruling that it is clearly warrants rethinking.[13]

### CONCLUSION

The implications of the original *per curiam* are profound and pervasive, as to

**11.** I do not argue that, in cases of independent witness exposure, *Kastigar* protections can, in the words of my colleagues, "be easily evaded." Rather I simply stress that independent witness exposure is different from prosecutorial exposure, and that that difference deserves recognition. ·

My colleagues' invocation of *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), is therefore inapposite. *Portash* dealt with the *direct* use of a defendant's immunized testimony by the *prosecutor* to impeach his testimony at a criminal trial. The issue before us, of course, is far removed from *Portash;* it involves the proceedings necessary to prevent any untoward effects arising from the exposure of third-party witnesses to immunized testimony through the media.

**12.** I do not agree with my colleagues' claim that the IC "expressly conceded" this point at oral

argument. Opinion on Petition for Rehearing at 949. My review of the record, briefs, and transcript indicates that there was no concession—a conclusion reinforced by Judge Ruth B. Ginsburg's incisive analysis of the dialogue between IC counsel and this court. *See* Statement of Judge Ruth B. Ginsburg Dissenting from Denial of Rehearing *En Banc.* Moreover, even if my colleagues' view of this exchange were correct, a concession is not the appropriate vehicle for deciding the future law of this circuit.

**13.** I feel compelled to take issue with my colleagues' suggestion, Opinion on Petition for Rehearing at 950, that I have acquiesced in their interpretation of 18 U.S.C. § 2071(b) as requiring *"subjective* knowledge of unlawfulness." Maj. op. at 886 (emphasis in original). In fact, my original dissent directly challenged this analysis at some length. *See* Diss. op. at 928–929, 930–932.

both the use-immunity and the authorization-intent issues.[14] It is difficult to think of a case of more exceptional importance, or, consequently, a case more worthy of rehearing by the panel or by the court *en banc*.

Before WALD, Chief Judge, MIKVA, EDWARDS, RUTH B. GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, THOMAS, HENDERSON, and RANDOLPH, Circuit Judges.

### ORDER

PER CURIAM.

Appellee's Suggestion for Rehearing *En Banc* has been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing, it is

ORDERED, by the Court *en banc*, that the suggestion is denied.

Circuit Judges MIKVA and EDWARDS did not participate in this matter.

Chief Judge WALD would grant the suggestion for rehearing en banc on the grounds set forth in her dissent from the original panel decision and from the denial of rehearing by the panel.

Circuit Judge RUTH BADER GINSBURG would grant the suggestion for rehearing *en banc* with respect to the Count 9 Authorization Instructions only. Her statement is attached.

Statement of RUTH BADER GINSBURG, Circuit Judge, dissenting from the denial of the suggestion for rehearing en banc with respect to Count 9 Authorization Instructions:

A majority of the panel held that a government official may not be convicted under 18 U.S.C. § 2071 for altering, concealing, or shredding official documents if he believed, however unreasonably, that his actions were legal. Section 2071, the panel held, requires the prosecution to show that the official had *no* belief, not even a patently unreasonable belief, in his actions' legality. The panel's conclusion does not follow obviously from the statutory terms "willfully and unlawfully." Nor did the panel justify its interpretation on the basis of prior constructions of § 2071, the statute's legislative history, or—unlike the dissent—compelling policy reasons. Rather, the panel's interpretation of § 2071 relies on the Independent Counsel's purportedly clear concession that the statute requires proof of "subjective knowledge" that the action was illegal. I see no such concession, either in the Independent Counsel's brief or at oral argument.

North's opening brief contended that the statute requires that "[a] defendant's intent must be judged by a subjective standard," citing *Morissette v. United States*, 342 U.S. 246, 276, 72 S.Ct. 240, 256, 96 L.Ed. 288 (1952), and *United States v. Rhone*, 864 F.2d 832 (D.C.Cir.1989). Brief of Appellant at 37. North concluded that the trial judge had committed reversible error by instructing the jury on Count 9 that only a reasonable belief in his actions' proper authorization could negate North's criminal intent under § 2071. *Id.* The Independent Counsel's brief disputes this conclusion directly, arguing that "an unreasonable belief that an order to lie to Congress or alter official records made such conduct legal no more negates guilt than would an unreasonable belief that the conduct itself had not been prohibited." Brief for Appellee at 39. The Independent Counsel notes that North cited no case interpreting § 2071 that sustains the defense position, and then directly disputes the relevance of *Morissette* and *Rhone*—North's

---

**14.** I gladly join my colleagues in the vacation of Section II of the original *per curiam* which reversed North's conviction on Count Nine because of the trial court's failure to issue a unanimity instruction. Although I thought such an instruction unnecessary even on the (erroneous) assumption that three episodes of document handling were involved, it is of course even clearer now that the trial judge was correct in the first place.

support for his claim that § 2071 requires proof of subjective knowledge. *Id.* at n. 73. I see no basis for deriving from this concise, precisely-trained discussion any waiver of the prosecution's right to dispute North's contention (swiftly accepted by the panel) that § 2071 requires proof of subjective knowledge.

Nor would I extract a dispositive concession from the colloquy at oral argument on which the per curiam opinion on rehearing ultimately relies. As the transcript of oral argument indicates, the topic of discussion immediately before and directly after the Independent Counsel's purported concession was Count 6, not Count 9. The question to which Mr. Lynch responded "Yes"— the moment at which he is said to have made his "express" concession—was a question about Count 6, not Count 9. The sole reference to the Independent Counsel's position on "subjective knowledge" and Count 9, however, was parenthetical, placed between a statement about Count 6 and the question about Count 6.* At no point during Mr. Lynch's presentation did he or the panel pause to focus singularly on the relation of North's authorization evidence to Count 9. Given the number and complexity of issues Mr. Lynch had to discuss, and 'the barrage of questions he faced from the bench, the court should be loath to find a concession, either express or implied.

I agree with Chief Judge Wald that the panel's conclusion on this issue is troubling and warrants further consideration. The panel majority has declared its ruling on the merits good for this day and case alone, and so deems the matter not worthy of en banc consideration. See per curiam opinion on rehearing at 950. I think it vital, however, to dispel the impression that, in responding to questions before the D.C. Cir-

cuit, diligent counsel are best advised to just say "No."

---

* QUESTION: I want to come back to the grand juror question and the tension or supposed tension between the Supreme Court and the Second Circuit on that. I will start with a question that I pushed Appellant's counsel on, which is the instructions to the jury on specific intent on Count 6.
 MR. LYNCH: Yes.

QUESTION: I am inclined to think you are correct, that that does not require knowledge of unlawfulness, as Count 9 does and you concede. And I think you say in your brief, and I think you are correct, that it requires at least knowledge of wrongfulness. Is that correct?
 MR. LYNCH: Yes.