609 A.2d 1112 (1992)
William M. JOHNSON, Appellant,
v.
UNITED STATES, Appellee.
No. 89-CF-794.
District of Columbia Court of Appeals.
Argued December 6, 1990.
Decided May 19, 1992.
Lesley S. Zork, Public Defender Service, with whom James Klein and Henderson Hill, Washington, D.C., were on the brief, for appellant.
Lynn Leibovitz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.
Before ROGERS, Chief Judge, and PRYOR and BELSON,[*] Senior Judges.
BELSON, Senior Judge:
Appellant William M. Johnson was convicted by a jury of second-degree murder while armed in violation of D.C.Code §§ 22-2403, -3202 (1989). He argues that a detective obtained the first of his two statements through the use of coercive tactics that are repugnant to the due process and self-incrimination provisions of the Fifth Amendment of the United States Constitution, and that the trial court committed reversible error by allowing the government to introduce into evidence a subsequent statement derived from his prior involuntary statement. We affirm.

*1113 I.
On August 28, 1987, at approximately 8:00 p.m., Quentin Cooper was stabbed in the chest while in the basement of an apartment building at 2308 Green Street, S.E., Washington, D.C. After being stabbed, Cooper ran across a courtyard where he collapsed in the doorway of an apartment and died before police and ambulance arrived.
On September 20, 1987, at approximately 1:45 a.m., appellant Johnson was arrested in a hallway of the same apartment building by Detective Frank Kahan pursuant to what he believed to be an outstanding warrant for prison breach.[1] Detective Kahan advised Johnson of his Miranda[2] rights, reading him the warnings from the police department rights card, and had him transported to the homicide office where Johnson arrived at 2:15 a.m.
At the homicide office Detective Kahan took Johnson to an interview room where Detective Kahan once again advised Johnson of his Miranda rights. Johnson read all the questions on his "rights card" and wrote "yes" next to each, thereby indicating that he waived his right to remain silent. Detective Kahan then signed and dated the card containing Johnson's written waiver. For the next hour, Detective Kahan asked Johnson additional questions necessary to process his arrest and told Johnson that his name was being associated with the stabbing death of Cooper. According to Detective Kahan, appellant did not appear to be intoxicated, but was cordial and cooperative. Johnson said that he would discuss his knowledge of the stabbing with Detective Kahan, and agreed with Detective Kahan's suggestion that Johnson's remarks be videotaped.
Johnson's videotaped statement began at approximately 3:30 a.m. It reveals that Detective Kahan once again showed Johnson the rights card.[3] Johnson confirmed that he had been read his rights, understood them, and waived them, and had not been made any promises in connection with his waiver. Johnson then stated that he was in the hallway of the apartment building "serving some people some coke." Two individuals from New York, a "short dude" whose name Johnson did not know, along with a "tall dude" named Larry Lewis, emerged from the laundry room. Lewis conversed with Cooper and accused him of taking some of Lewis' drugs. According to Johnson, Lewis then cleared everyone out and, as Johnson attempted to go upstairs, Cooper tried to run up the stairs behind Johnson and "got hit."
At this point during the videotape Johnson interjected "could ya'll take me to jail  I'm begging you please." Detective Kahan, however, continued to question Johnson. In addition to recounting again the stabbing incident, Johnson also gave for the first time a physical description of Lewis and stated that Lewis had a knife in his hand, that blood splashed on Johnson, and that everybody came to Johnson asking him what had happened. After making his statement, Johnson was released by the police.
On December 11, 1987, over two and one-half months later, two officers of the Fourth Police District arrested Johnson at 4:30 p.m. in the area of Georgia Avenue and Park Road, N.W., pursuant to a warrant charging him with murdering Cooper. The two officers transported Johnson at approximately 5:05 p.m. to the homicide branch of the Metropolitan Police Department. Detective Dwayne Stanton attempted unsuccessfully to contact Detective Kahan, the affiant on the warrant, who was off duty. Detective Stanton then processed Johnson, took him to an interview room in the homicide office, and read Johnson his Miranda rights. Johnson responded that he understood his rights, and read and answered each question on the *1114 police department rights card by writing "yes" to all questions. Detective Stanton then signed, dated, and entered the time on the card. In response to Detective Stanton's question of whether Johnson had anything he wanted to say regarding the Cooper homicide, he stated that he had previously given a statement to Detective Kahan which reflected what he had to say and it would remain unchanged.
When Detective Stanton asked Johnson whether he wanted to go over his statement, Johnson responded that he was present when the stabbing occurred, a New Yorker got into a fight with Cooper and stabbed him, and that Cooper fell back on Johnson, getting blood on his shoes. Detective Stanton asked Johnson whether he still had the shoes. According to Stanton, Johnson responded that "he had thrown them away and that people always blamed things on him. That's why he didn't get involved, or words to that effect."
Johnson filed a motion to suppress both the September and December statements, arguing that because he was not adequately advised of his Miranda rights, his statements were involuntary. The trial court viewed the September videotaped statement and determined that Johnson initially waived his Miranda rights, but attempted unsuccessfully to terminate the interview when he first stated "take me to jail." The judge ruled that the initial portion of the tape prior to this statement would be admissible at trial but that any statements following Johnson's initial request to be taken to jail were suppressed because "I think Kahan overbore this defendant." The judge went on to rule that Kahan "was coercive at that point and I think he badgered this defendant."
The trial judge denied Johnson's motion to suppress his December statement, finding that
[t]he second statement the Court rules is 100 percent clean. The officer followed all of the rules, gave him his rights, he waived them voluntarily and knowingly. When the defendant gave him his statement, he gave him his statement. I said in light of what's happened that part of it, I mean, he can say he agreed with the statement he gave.
The trial judge further stated that "it doesn't seem there's a problem with the second [December] statement, because the second statement can refer to, [the first portion of the September statement], which will be in, but let me say this.... I'm not going to let [the second portion of the September statement] even be used ... in rebuttal."
At trial, the government displayed to the jury the admissible first portion of Johnson's videotaped September statement made to Detective Kahan, and introduced into evidence Johnson's entire December statement made to Detective Stanton. Defense counsel objected, but later decided during trial to show the entire September videotaped statement, including the second portion originally suppressed by the trial court.[4]

II.
Johnson contends that once the trial court ruled that the videotaped September statement given to Detective Kahan was involuntary (referring, we must assume, only to the second portion of that statement), the government could not use it, either directly or indirectly. Johnson emphasizes that the coercive tactics employed by Detective Kahan to compel Johnson to talk violated the Due Process Clause and his Fifth Amendment right to be free of self-incrimination. He contends that the *1115 government could not permissibly introduce into evidence Johnson's December statement because the government failed to prove that it was not directly produced by the earlier coerced September statement.[5]
We need not detain ourselves long in assessing the correctness of the trial judge's rulings concerning the use the government could make of the first, September, statement itself. The record fully supports the trial judge's decision that what appellant said in his videotaped September statement up until the point that Johnson first requested to be taken away to jail was admissible, and that as to it appellant had waived his Miranda rights. The detective had employed no coercive or otherwise impermissible tactics up to that point. The trial judge, however, properly suppressed the portion of that statement that followed that request in light of her finding that the detective "overbore" Johnson, engaged in "coercive" conduct, and badgered him after Johnson requested to be taken to jail.
Johnson's position on his principal point on appeal, that the December statement was not independent of the September statement, is undercut by two serious weaknesses. The first is that Johnson stated the essence of his account of the fatal incident during the first  voluntary  part of his September statement, and so it is not tenable to argue that there is a "cat out of the bag" issue presented by the way the police obtained the second part of the statement. The cat was already out. By far the most important feature of Johnson's September statement was his admission at the outset that he was present in the hallway of the apartment when the stabbing occurred. Johnson went on to say, in the first part of his statement, that he had tried to go upstairs and the victim (Cooper) tried to run behind him and "got hit." If the second statement was a product of the first statement to any degree, it was almost entirely a product of the first statement's voluntary first portion which gave Johnson's essential account of the incident rather than the product of its later portion which repeated that account and added some details. The second weakness is that the connection between the two statements was so attenuated by time and circumstances in any event that we find convincing the government's argument that there was no causal relationship between the two statements.
Turning to the first of those weaknesses, we observe again that the trial judge's conclusion that the initial portion of the first statement was given voluntarily is plainly supported by the record. The main elements of Johnson's later December statement were that he was present at the scene of the stabbing, that the decedent and a New Yorker [Larry Lewis] were in an altercation, and that the New Yorker stabbed the decedent as he attempted to leave. These statements were basically a voluntary reiteration of the admissible, first portion of Johnson's videotaped September statement.[6] Thus, Johnson's December statement cannot be said to be a direct product of involuntary portions of the previous statement. To the extent that it may be argued at all that the December statement was the product of the September statement (a thesis we find unpersuasive as we will explain shortly), it would be far more logical to argue that it was the product of the voluntary part of the earlier statement. See Bliss v. United States, 445 *1116 A.2d 625, 632 (D.C.) (cat-out-of-bag argument for suppression fails for reason, inter alia, that earlier confession was validly obtained), modified, 452 A.2d 172 (D.C. 1982), cert. denied, 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983).
Johnson also argues that he was harmed by the fact that he referred in his December statement to getting blood on his shoes, a fact he had not included in the voluntary portion of his September statement, but mentioned generally in its involuntary portion. We regard any tendency of this testimony to incriminate as weak at best. The voluntary portion of the September statement had decedent following Johnson as they fled from the room, suggesting that Johnson and decedent could well have been in close proximity. It would not be surprising that a person would get blood on his shoes when an attacker stabs a victim in close proximity in the chest, severing his aorta, and also cuts the victim's hands. Moreover, another government witness, Mary Sellman, testified that Johnson's shoes were spotted with a red substance. Under these circumstances, it is difficult to argue that there is any substantial incrimination that resulted from the added specificity of Johnson's December statement. Of equally limited significance are Johnson's further remarks in his December statements, viz., that he had discarded the shoes and that people always blamed things on him, and also that he did not want to get involved in the incident.
Finally, even if we should assume arguendo that the entire September statement was invalidly obtained, the record does not support Johnson's position that the December statement was the product of the September statement, but rather supports the contrary conclusion. In Ruffin v. United States, 293 A.2d 477, 480 (D.C.1972), this court adopted the approach to successive confessions articulated by Justice Harlan in Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (per curiam). Justice Harlan wrote:
A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has little to lose by repetition....
In consequence, when the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has, in my view, the burden of proving not only that the later confession was not itself the product of improper threats or promises or coercive conditions, but also that it was not directly produced by the existence of the earlier confession.
Id. at 350-51, 88 S.Ct. at 1490 (Harlan, J., concurring in part and dissenting in part).
To apply this test to our case, we must determine first whether Johnson's December statement itself was permissibly obtained. Johnson does not contest the fact that, save for the influence of his earlier statement, he knowingly and voluntarily gave his December statement to Detective Stanton. Detective Stanton advised Johnson that he was arrested pursuant to a warrant charging him with the second-degree murder of Quentin Cooper. Detective Stanton read Johnson his Miranda rights; Johnson replied that he understood all of them, read and answered each question on the police department rights card, and signed his complete name on the card. According to Detective Stanton, during this time Johnson was not handcuffed, appeared to be calm and cool, and denied use of any alcoholic beverages. We also note that this was not Johnson's first encounter with the police. According to the Pretrial Services report, Johnson had six prior convictions, at least three of which were felonies, a circumstance that suggests that he was aware of the procedures police must follow to honor Miranda rights.
The totality of the above circumstances strongly suggests that the trial court properly concluded that Johnson gave his December statement to Detective Stanton voluntarily rather than as the result of improper threats, promises, duress or coercion. See Oregon v. Elstad, 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985) ("[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.") (quoting United States v. *1117 Washington, 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977)); see also Miranda, supra note 2, 384 U.S. at 478, 86 S.Ct. at 1630 ("[v]olunteered statements of any kind are not barred by the Fifth Amendment....").
But we must look beyond the circumstances surrounding the taking of the December statement. Ultimately the controlling issue is whether Johnson's December statement was "directly produced" by the existence of his September statement. Darwin, supra, 391 U.S. at 351, 88 S.Ct. at 1490; see also Lewis v. United States, 483 A.2d 1125, 1129 (D.C.1984). Instructive on this point is Boykins v. United States, 366 A.2d 133 (D.C.1976). In Boykins, the defendant was arrested on February 22, 1973, in the District of Columbia for his participation as an accomplice in the robbery of a liquor store in the District. Id. at 134. Interrogated while en route to the police station, Boykins admitted to his participation in the robbery. Id. The trial court eventually suppressed this confession because it was not obtained in compliance with the standards of Miranda. Boykins, supra, 366 A.2d at 134. In the meantime, on March 5, 1973, in Norfolk, Virginia, Boykins had voluntarily accompanied agents of the Federal Bureau of Investigation to their office for an interview regarding a separate incident unrelated to the robbery in Washington, D.C. Id. Boykins voluntarily waived his rights and made incriminating statements connecting him with the liquor store robbery. Id. at 134-35.
This court rejected Boykins' argument that his Norfolk statement should have been suppressed because it was a product of his earlier suppressed confession. We based our conclusion on the following factors: first, Boykins' waiver of his Miranda rights "sufficient dissipate the effect of the prior invalid confession" to the local police, id. at 136; second, a "continuous sequence" of confessions did not arise because of a ten-day period between the Washington, D.C. statement and the Norfolk statement; and third, Boykins had consulted with his counsel prior to his presentment for the armed robbery offense nine days before his Norfolk statement. Id. at 134, 136.
There is more attenuation here than there was in Boykins. Over two and one-half months passed between Johnson's September and December statements. During that time, Johnson was at liberty, not subject to any questioning or control by the police. The lapse of time between the two statements precluded "a continuous sequence," but represented a distinct break. See Darwin, supra, 391 U.S. at 351 n. *, 88 S.Ct. at 1491 n. *.
Additionally, the statements were taken by different investigators  the September statement by Detective Kahan and the December statement by Detective Stanton. According to Detective Stanton, he was unaware that the September statement was videotaped at the time he interviewed Johnson in December. Thus, any coercive effect of successive interviews by the same investigator was not present here. Moreover, each detective, prior to interviewing Johnson, separately obtained at the outset a valid waiver of rights (although Kahan had later ignored Johnson's request to end the first interview).
We are aware that in his second statement Johnson referred back to his first statement and said that it reflected what he had to say. The trial judge was also aware of that fact, but found the second statement was voluntary, observing that Johnson "can say he agreed with the statement he gave."
Thus the issue is whether the government's strong showing of attenuation is sufficient to overcome the fact that Johnson obviously had the previous statement in mind during the second interview when he affirmed it. While we find the question close, we are satisfied that under all the circumstances, the trial judge's view is sustainable. We emphasize, however, that in any event the second statement is admissible in view of the voluntary nature of the first portion of Johnson's September statement *1118 upon which the later statement is essentially based.[7]
In sum, we find no merit in Johnson's assertions that he was prejudiced by the government's use at trial of the second statement he made to Detective Stanton.[8]
Based on the foregoing, Johnson's conviction is
Affirmed.
ROGERS, Chief Judge, dissenting:
I agree with the majority that the issue in this appeal is whether the December statement was "directly produced by the existence of" the involuntary portion of the September statement. Majority opinion at 1117 (quoting Darwin v. Connecticut, 391 U.S. 346, 350-51, 88 S.Ct. 1488, 1490-91, 20 L.Ed.2d 630 (1968) (Harlan, J., concurring in part and dissenting in part). In answering that question, however, I believe that the majority applies the wrong standard, and in the process incorrectly concludes that the second statement was free from the taint of the first one. Furthermore, because the error was not harmless, I would reverse the judgment and remand the case for a new trial.

I
The Supreme Court has made clear that the "fruit of the poisonous tree" doctrine applies to violations of the Fifth Amendment, requiring the suppression of evidence obtained indirectly as a result of a coerced confession, including an otherwise "clean" confession obtained as a result of an earlier involuntary confession. Oregon v. Elstad, 470 U.S. 298, 306-07 & n. 1, 105 S.Ct. 1285, 1291-92 & n. 1, 84 L.Ed.2d 222 (1985). This doctrine is necessary to protect a defendant who has no knowledge that the first confession is inadmissible. As Justice Harlan explained, "a suspect might make a second or third confession [because], having already confessed once or twice, he might think he has little to lose by repetition." Darwin v. Connecticut, supra, 391 U.S. at 350, 88 S.Ct. at 1490 (Harlan, J., concurring in part and dissenting in part).
I agree with the majority that the appropriate test for determining whether the December statement is a fruit of the earlier coerced confession can be found in Ruffin v. United States, 293 A.2d 477, 480 (D.C. 1972) (quoting Darwin v. Connecticut, supra, 391 U.S. at 351, 88 S.Ct. at 1490 (Harlan, J., concurring in part and dissenting in part)):
[W]hen the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has, in my view, the burden of proving ... that it was not directly produced by the existence of the earlier confession.
Contrary to the majority, however, I cannot conclude that the government met its "burden of proving" that the December statement was not directly produced by the existence of the coerced confession. The majority relies on the facts that (1) "[o]ver two and one-half months passed between [the] September and December statements," (2) "the statements were taken by different investigators," and (3) "each detective, prior to interviewing [appellant], separately obtained a valid waiver of rights."[1] None of these facts is sufficient *1119 to counter Detective Stanton's testimony that the second statement was nothing more than a reiteration of the earlier confession:
[Appellant] related ... that he had previously been into the office and he had given Detective Kahan a statement which reflected what he had to say and that the statement was basically the same thing he had to say on that particular day.
So I asked him would he go over what he said in the statement with Detective Kahan and he [did so].... [Emphasis added]
As this testimony makes clear, appellant's second confession began when Detective Stanton asked him what he knew about the Cooper murder. Appellant immediately referred to his prior statement. Thus, from the beginning of the second interview appellant had focused on the earlier coerced confession. Detective Stanton then asked appellant to "go over what he said in the statement with Detective Kahan," further directing appellant to recall the contents of the involuntary confession. Under such circumstances, the majority strains to conclude that the second confession was completely independent of the earlier coerced confession.[2] In my view, Detective Stanton "did not conduct an interview distinct from the coerced confession. He instead asked [appellant] what he had told [Detective Kahan].... [It was] an indirect way of getting the coerced confession itself into evidence." Wilson v. O'Leary, 895 F.2d 378, 383 (7th Cir.1990).[3] Accordingly, the December statement should be "no more admissible than the original" coerced confession. Id. at 384.
The majority "find[s] the question close," majority opinion at 1117, and buttresses its conclusion with a second argument: "[appellant] stated the essence of his account of the fatal incident during the first  voluntary  part of his September statement, and so it is not tenable to argue that there is a `cat out of the bag' issue presented by the way the police obtained the second part of the statement." Majority opinion at 1115. Apparently because most of the content of the December statement was contained in the voluntary portion of the September statement, the majority concludes that it is "far more logical to argue that [the December statement] was the product of the voluntary part of the earlier statement." Id. at 1115.
The majority cites no case, however, for the proposition that the government can meet its burden of proving that a statement is not a fruit of a Fifth Amendment violation simply by showing that the statement's content overlaps with an earlier voluntary statement. In the analogous area of the scope of "use immunity," the Supreme Court has made clear that the government bears a much heavier burden. In Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court upheld the constitutionality *1120 of the use immunity statute,[4] only after concluding that it provided protection that was "coextensive with the scope of the privilege against self-incrimination...." Id. at 453, 92 S.Ct. at 1661. The Court viewed the "statutory provision ... analogous to the Fifth Amendment requirement in cases of coerced confessions." Id. at 461, 92 S.Ct. at 1665. In either context, the government bears the "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." Id. at 461-62, 92 S.Ct. at 1665:
This burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.
Id. at 460, 92 S.Ct. at 1665.[5]
Under the Kastigar test, the government has failed to meet its "heavy burden" of demonstrating that the December statement is "wholly independent" of the coerced confession merely by showing that its content overlapped with the voluntary portion of the September statement. Part of appellant's statement was coerced,[6] and appellant, at the time he made the December statement, had the entire September statement on his mind. In the absence of any showing by the government that it took pains to limit the December questioning to the voluntary portion of the September statement, I fail to see why it "would be far more logical to argue that [the December statement] was the product of the voluntary part of the earlier statement," as opposed to the involuntary part. Indeed, it would seem logical  at least until the government shows otherwise  to conclude that the December statement was the product of both the voluntary and involuntary portions of the earlier statement. See North, supra note 5, 287 U.S.App.D.C. at 148, 920 F.2d at 942 ("Kastigar is ... violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony").
Moreover, even if the government could meet its burden simply by comparing the content of the two statements, the majority ignores the fact that the December statement referred, in significant respect, to information that was only included in the involuntary portion of the September statement. During the voluntary portion of the videotaped confession appellant stated that two guys from New York argued with the decedent and told everyone to get out of the room. As appellant started to exit by climbing up some stairs, the decedent climbed up behind appellant and Larry Lewis stabbed the decedent. In the involuntary part of the interview, however, appellant made several additional incriminating statements. In one crucial passage appellant admitted being so close to the decedent at the time of the stabbing that "when the man hit him, the man hit him on me [and] blood splashed on me." Appellant also told the detective that everyone came up to him after the stabbing, asking him what had happened and accusing him.
The second confession repeated and expanded on testimony that was only in the involuntary portion of the September statement. *1121 During the second confession appellant stated that the New Yorker stabbed the decedent as the decedent was going up the stairs and that the decedent fell backwards onto appellant, causing blood to get on appellant's clothing. When asked if he still had the clothing, appellant explained that he threw it away. Appellant also said that he fled the scene because he was afraid that he would be blamed for what had happened because people were "always blam[ing] those things on him." Thus, although the second confession refers to both the voluntary and involuntary parts of the first confession, in large part the second confession is an elaboration on statements made only during the involuntary portion of the first confession. Therefore the government failed to meet its "heavy burden" of demonstrating that the second confession was not produced by the existence of the earlier coerced confession. Kastigar, supra, 406 U.S. at 461, 92 S.Ct. at 1665.

II
The Supreme Court has recently held that harmless error analysis, see Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), applies in the context of an improperly admitted coerced confession. Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 1263-66, 113 L.Ed.2d 302 (1991) (Rehnquist, J., delivering the opinion of the court on this issue); id. 111 S.Ct. at 1266 (Kennedy, J., concurring in the judgment). Because, under Chapman the error was not harmless beyond a reasonable doubt, I would reverse the judgment and remand the case for a new trial.
The December confession included appellant's statement that at the time of the murder the decedent fell backward on appellant, getting blood on his tennis shoes (which he threw away). In the December statement appellant also stated that "people always blamed those things on him." These statements, particularly the blood-on-the-shoes statement, were very damaging to appellant's defense. Unlike any statements in the voluntary portion of the September confession, the December statement placed appellant very close to the decedent at the time of the stabbing. The blood-on-the-shoes statement made it appear much more likely that appellant was the assailant. The version in appellant's voluntary statement was far less inculpatory, since it included only the statement that the two "New York dudes" told the several people in the basement to clear out, and as appellant tried to flee, "the [decedent] tried to run behind me and the man hit him."
The "blood-on-the-shoes" statement also corroborated the testimony of Mary Sellman, who testified that after the stabbing appellant left a bag in her apartment that contained shoes with blood on them. Sellman, who also testified that appellant admitted arranging for the decedent to be stabbed, was seriously impeached. Indeed, at one point the trial judge cautioned the government that Sellman's demeanor on the witness stand was so non-responsive that "if she [got] much worse, [he'd] strike all of the testimony because her behavior is borderline contemptuous." Thus, the error of allowing appellant's December corroborating statement could have convinced the jury to accept the rest of Sellman's dubious testimony. See Arizona v. Fulminante, supra, 111 S.Ct. at 1259 (White, J., delivering the opinion of the Court on this issue) (admission of a confession not harmless because "the jury might have believed that the two confessions reinforced and corroborated each other. For this reason, one confession was not merely cumulative of the other") (emphasis in original).[7]
Finally, in closing argument the government emphasized the "inconsistency" between appellant's September and December statements. In the September statement appellant identified the killer as Larry Lewis, while in the December statement appellant could not remember the name. The prosecutor argued that this discrepancy undermined *1122 appellant's credibility.[8] If the December statement had been properly excluded, the government would have been unable to make such an argument.
The government's case rested principally on the testimony of two witnesses, Sellman and Markeith Muskelly, both of whom were substantially impeached with prior inconsistent statements.[9] The government used the December statement to bolster a case which the government concedes was not overwhelming. Under the circumstances, I cannot "declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman, supra, 386 U.S. at 24, 87 S.Ct. at 828.
NOTES
[*] Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.
[1] Because the police computer still reflected the warrant as outstanding, Detective Kahan was unaware that the warrant had been quashed.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The videotape was made a supplemental record on appeal. It was not transcribed but was available to the court to listen to and view.
[4] The trial judge made it clear that although the government was prohibited from using the suppressed portion of the videotape, appellant could show the remaining portions of the tape.

Oh, you have the right to bring in the entire rest of the tape if you want. I mean, that is absolutely your right. I suppressed it from the Government, not the defendant.
Now, what you can't bring in is parts of it, because otherwise I will let the Government bring in the rest of it. If you want to bring in the rest of it, you may do so.
Defense counsel finally stated that "I would like to just explain that it is because of the fact, especially as to the second set of statements coming in through Detective Stanton that I, that that is why I feel it is appropriate."
[5] The government would not have had to satisfy as heavy a burden if the initial confession (or part of it) had been excludable merely because of a violation of appellant's Miranda rights, as distinguished from coercive conduct. Cowan v. United States, 547 A.2d 1011, 1015 (D.C.1988), (citing Oregon v. Elstad, 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985)).
[6] Our dissenting colleague refers to Johnson's September statement as "the earlier coerced," and "the involuntary confession." Dissenting opinion at 1118-1119. By so doing, she ignores the trial court's finding that the initial portion of Johnson's September statement (until he first requested to be taken to jail) was completely voluntary and not in violation of Miranda.

The dissent also calls attention to the fact that the part of Johnson's statement that came after his request to go to jail was longer than the part that preceded it. It is the substance of what was said that matters, however, and not the length of time it took to say it.
[7] Johnson's reliance on United States v. North, 285 U.S.App.D.C. 343, 910 F.2d 843, withdrawn and superseded in part, 287 U.S.App.D.C. 146, 920 F.2d 940 (1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), and Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), is misplaced because they address immunized testimony, a subject matter clearly distinct from the one presented in this case. The analogy drawn by the Supreme Court in Kastigar, 406 U.S. at 461-62, 92 S.Ct. at 1665-66, between immunized testimony and coerced confessions under the Fifth Amendment is not applicable here because, as we have stated, the first portion of Johnson's statement, which set forth its issues, was not coerced.
[8] The Supreme Court has recently held that admission of a coerced confession is to be reviewed under the harmless error rule of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 1265-66, 113 L.Ed.2d 302 (1991). There is no harmless error issue in the present case, as no coerced confession was admitted.
[1] This third "fact" is somewhat misleading. Although Detective Kahan administered a Miranda warning at the beginning of the videotaped statement, he later ignored appellant's persistent requests to end the questioning. Contrary to the majority's implication, the detective did not obtain a "valid" waiver with respect to the latter portion of appellant's September statement.
[2] The majority's reliance on Boykins v. United States, 366 A.2d 133 (D.C.1976), see majority opinion at 1117, is puzzling since the second interview of the defendant in Boykins concerned a totally separate event (the shooting of a federal official) that was unrelated to the liquor store robbery at issue, and was the first interview by the FBI, the earlier confession to the robbery having been made to local police. Id. at 134-35 ("the FBI agents did not set out to interview [the defendant] about the [liquor store robbery] offense under review"). Also, unlike appellant, the defendant in Boykins had already been appointed counsel on the robbery charge before the FBI interview occurred. The court noted that the trial judge had found, after a hearing, that (1) the defendant's "valid waiver of rights" at the FBI interview, (2) the lapse of ten days, "and (3) the intervening consoltation with counsel at the time of [the defendant's] presentment in [the robbery] case were sufficient to dissipate the effect of the prior invalid confession." Id. at 136 (emphasis added).
[3] In Wilson v. O'Leary, supra, a police officer allowed an angry mob to question Wilson, and another detective later asked Wilson what he had told the mob. 895 F.2d at 383. The court held that the latter statement was "no more admissible than the original" coerced confession. Id. at 384.
[4] The statute, 18 U.S.C. § 6002, provides that a court may order a witness to offer testimony that would otherwise be privileged under the Fifth Amendment, but "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." Id.
[5] The majority unconvincingly distinguishes Kastigar and United States v. North, 287 U.S.App.D.C. 146, 920 F.2d 940 (1990), as inapplicable. See majority opinion at 1118 n. 7. Everyone  appellant, the government, and the majority (see Majority opinion at 1114) accepts the trial judge's finding that the second part of the September statement was coerced. The only question in this appeal is whether the December statement was the product of the earlier coerced statement, which is precisely the point of the Kastigar analogy that the majority finds "not applicable."
[6] The voluntary portion of the September statement was two and one-half minutes long, while the involuntary portion lasted eight minutes.
[7] Thus, the majority's reliance on Sellman's testimony as evidence that appellant was not prejudiced by the admission of the December statement, majority opinion at 1116, misses the mark.
[8] The prosecutor made the following argument:

Ladies and gentlemen, the defendant two times told the police that, yes, I did not do it. He was there but it was a New Yorker. The first time he said it was a man named Larry Lewis. The second time he could not remember his name. Ladies and gentlemen it's up to you to determine the credibility of the witnesses. It's up to you to decide what happened here. It's up to you to come back with a verdict.
[9] Muskelly had made three pre-trial statements that ranged from denying being present at the time of the stabbing, to admitting being present near the scene but denying seeing who committed the stabbing. At trial Muskelly identified appellant as the assailant.