Kevin and Monica CLIFFT, Petitioners,

v.

**INDIANA DEPARTMENT OF STATE REVENUE and Kenneth L. Miller, Commissioner, Respondents.**

No. 49T10–9308–TA–00064.

Tax Court of Indiana.

Oct. 11, 1994.

Andrew C. Maternowski, Dillon Law Office Indianapolis, for petitioners.

Pamela Carter, Atty. Gen. of Indiana and David A. Arthur, Deputy Atty. Gen., Indianapolis, for respondents.

FISHER, Judge.

Indiana levies a tax on the delivery, possession, and manufacture of controlled substances (the controlled substance excise tax or CSET).[1] The present appeal, before the court on the parties' cross motions for partial summary judgment, challenges the constitutionality of the CSET. Specifically, the petitioners, Kevin and Monica Clifft, raise the following issues:

I. Whether the CSET violates the privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

II. Whether the CSET violates the Cliffts' equal protection rights under the Fourteenth Amendment to the United States Constitution.

III. Whether the CSET violates the Cliffts' due process rights under the Fourteenth Amendment to the United States Constitution.

IV. Whether the CSET violates the double jeopardy clause of the Fifth Amendment to the United States Constitution.[2]

---

**1.** IND.CODE 6–7–3–5.

**2.** In their motion for summary judgment, the Cliffts also claim the CSET violates their corresponding rights under Article I, §§ 14 and 23 of the Indiana Constitution.

A movant for summary judgment under Ind.Trial Rule 56(C) bears the burden to prove both the absence of a genuine issue of material fact *and* entitlement to judgment as a matter of law. *C & C Oil Co. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 570 N.E.2d 1376,

## BACKGROUND AND PROCEDURAL POSTURE

The CSET, which went into effect on July 1, 1992, is imposed on controlled substances that are:

(1) delivered;

(2) possessed; or

(3) manufactured;

in Indiana in violation of IC 35–48–4 or 21 U.S.C. 841 through 852. The tax does not apply to a controlled substance that is distributed, manufactured, or dispensed by a person registered under IC 35–48–3.

I.C. 6–7–3–5. Thus, a person becomes liable for the CSET "when the person receives delivery of, takes possession of, or manufactures a controlled substance in violation of IC 35–48–4 or 21 U.S.C. 841 through 852." IND.CODE 6–7–3–8. Failure to pay the tax when due gives rise "to a penalty of one hundred percent (100%) of the tax in addition to the tax." IND.CODE 6–7–3–11(a).

The amount of tax is based upon the weight and class of the substance. IND. CODE 6–7–3–6. Schedule I, II, and III substances are taxed at $40 per gram, while Schedule IV and V substances are taxed at $20 per gram and $10 per gram, respectively. *Id.* THC, the active ingredient in marijuana, is a schedule I substance. IND.CODE 35–48–2–4(d)(22).

On October 8, 1992, Indianapolis and Speedway police executed a search warrant for the Cliffts' home. In their search, the police discovered and confiscated six marijuana plants, baggies containing marijuana, and marijuana growing equipment. The Marion County Forensic Crime Laboratory weighed the marijuana, finding a total of 927 grams.

1378. Regardless of the existence or absence of a genuine issue of material fact on their state constitutional claims, the Cliffts have not attempted to show they are entitled to judgment as a matter of law. Indeed, they have made no argument to support their bare allegations, and therefore are not entitled to summary judgment. Consequently, the court will not consider the Cliffts' state constitutional claims further within the context of the present motions.

After law enforcement authorities shared their information with the Indiana Department of State Revenue (the Department), the Department assessed the Cliffts with CSET liability of $37,080, a 100% nonpayment penalty of $37,080, a 10 percent collection fee of $3,708,[3] and a clerk's charge of $3.00, for a total of $77,871.00. Interest began accruing immediately at the rate of $8.13 per day.

. On January 14, 1993, the Marion Municipal Court accepted a plea agreement between Mrs. Clifft and the Marion County Prosecutor. Mrs. Clifft pled guilty to possession as a Class A misdemeanor and received a six month driver's license suspension plus 365 days of incarceration, with 363 days suspended. The charges against Mr. Clifft were dropped. At the time of the hearing before this court in November 1993, the Cliffts had made no payments toward their CSET liability.

### DISCUSSION AND DECISION

Because this is an appeal from a final determination of the Department, the court hears the case *de novo* and is bound by neither the issues nor the evidence presented during the administrative proceedings. *Indiana Waste Systems of Indiana, Inc. v. Indiana Dep't of State Revenue* (1994), Ind. Tax, 633 N.E.2d 359, 362 (citing *Maurer v. Indiana Dep't of State Revenue* (1993), Ind. Tax, 607 N.E.2d 985, 986). In reviewing the parties' cross motions for partial summary judgment, the court is not to enter summary judgment unless there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *Id.* (citing *Harlan Sprague Dawley v. Indiana Dep't of Revenue* (1992), Ind.Tax, 605 N.E.2d 1222, 1225).

◼ Because the Cliffts challenge the constitutionality of the CSET, they face a difficult burden. They must rebut the strong presumption that statutes are constitutional. *See State Line Elevator, Inc. v. State Bd. of*

*Tax Comm'rs* (1988), Ind.Tax, 528 N.E.2d 501, 503.

### I

### SELF–INCRIMINATION

◼ The Cliffts first claim the CSET violates the privilege against self-incrimination under the Fifth Amendment to the United States Constitution. They maintain that the simple act of paying the CSET subjects taxpayers to "real and substantial" risks of incrimination. Counsel's argument is well made, but it cannot prevail.

#### A. Case Law

◼ It is well settled that, standing alone, the illegality of an activity, such as the unauthorized possession of marijuana or other controlled substances, does not preclude taxation of the activity. *Department of Revenue v. Kurth Ranch* (1994), — U.S. —, —, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767, 778 (and cases cited therein). Instead, when a state or the federal government seeks to tax illegal activity, the inquiry focuses on whether the relevant imposition and collection methods are consistent with the privilege. *See Marchetti v. United States* (1968), 390 U.S. 39, 44, 88 S.Ct. 697, 700, 19 L.Ed.2d 889, 895.[4] *See also Leary v. United States* (1969), 395 U.S. 6, 12, 89 S.Ct. 1532, 1535, 23 L.Ed.2d 57, 68; *Haynes v. United States* (1968), 390 U.S. 85, 90, 88 S.Ct. 722, 726, 19 L.Ed.2d 923, 928; *Grosso v. United States* (1968), 390 U.S. 62, 65, 88 S.Ct. 709, 712, 19 L.Ed.2d 906, 910–11. To violate the privilege under *Marchetti* and its progeny, the taxing obligations must create " 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination." *Marchetti* at 48, 88 S.Ct. at 702, 19 L.Ed.2d at 898 (citing *Regina v. Boyes*, 1 B & S 311, 330).

Each of the cited cases involved the taxation of illegal activity: gambling in *Marchetti* and *Grosso;* possession of sawed off shot-

---

3. IND.CODE 6–8.1–8–2(b).

4. That the statutes at issue in this appeal are taxing statutes is irrelevant to the availability of the privilege. The privilege "can be asserted 'in any proceeding, civil or criminal, administrative

or judicial, investigatory or adjudicatory.' " *Maness v. Meyers* (1975), 419 U.S. 449, 464, 95 S.Ct. 584, 594, 42 L.Ed.2d 574, 587 (quoting *Kastigar v. United States* (1972), 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212).

guns in *Haynes;* possession of marijuana in *Leary.* In all of them, the United States Supreme Court held the tax imposition and collection methods subjected the individuals involved to "real and appreciable" hazards of self-incrimination.

In *Marchetti,* the Internal Revenue Code created a wagering occupational tax for professional gamblers. People liable for the tax were required to register each year with the director of their local Internal Revenue district. The registration required disclosure of the registrant's name, residence and business address, a statement indicating whether the registrant was in the business of accepting wagers, and a list of the names and addresses of the registrant's agents and employees. *Marchetti,* 390 U.S. at 42, 88 S.Ct. at 699, 19 L.Ed.2d at 894. Upon paying the occupational tax, registrants received revenue stamps, which they were obliged to post conspicuously at their principal place of business. In the absence of a principal place of business, registrants were to carry the stamps on their person subject to inspection on demand by Treasury officers. Registrants were also to maintain daily records and keep them available for inspection by Treasury officers. In turn, each principal Internal Revenue office was required to maintain a publicly available list of all registrants and to share certified copies of the list on request with any state or local prosecutor. *Id.* at 43, 88 S.Ct. at 700, 19 L.Ed.2d at 895.

In *Grosso,* a companion case to *Marchetti,* the issue was the status of the wagering excise tax, not the wagering occupation tax. People engaged in the wagering business, and only those people, had to pay the wagering excise tax and file a return, disclosing "in the most direct fashion the fact of the taxpayer's wagering activities." *Grosso* at 65, 88 S.Ct. at 712, 19 L.Ed.2d at 910. There was no prohibition on the use of the information in the return, and the IRS, under no direct command either to disclose or withhold information, shared return information with law enforcement officials. *Id.* at 65–66, 88 S.Ct. at 712–13, 19 L.Ed.2d at 910–11.

In *Haynes,* the petitioner was convicted of failure to register a sawed-off shotgun with the Treasury Department as required by the National Firearms Act (the NFA). The NFA was designed to impose a tax on weapons used principally by people engaged in crime. *Haynes* at 87, 88 S.Ct. at 725, 19 L.Ed.2d at 926–27. Registration of sawed-off shotguns and other generally illegal weapons was required only if the registrant acquired the weapon unlawfully. The registration form required disclosure of the registrant's birth date, social security number, and record of felony convictions. The Court stated the registration requirement was "directed principally at those persons who have obtained possession of a firearm without complying with the [NFA's] other requirements, and who therefore are immediately threatened by criminal prosecution." *Id.* at 96, 88 S.Ct. at 730, 19 L.Ed.2d at 932.

Finally, in *Leary,* the Court analyzed the Marihuana Tax Act, which had two main elements, a tax on transfers of marijuana and an occupational tax on those who engaged in marijuana dealing. Transfers of marijuana required an order form, which was to contain the names and addresses of the transferor and transferee, their registration numbers under the occupational tax requirements, and the amount of marijuana transferred. The IRS was required to keep the information contained on order forms available to state and local prosecutors. 395 U.S. at 14–15, 89 S.Ct. at 1536–37, 23 L.Ed.2d at 69–70.

The constitutional infirmities that plagued the statutory schemes in the *Marchetti* line of cases do not exist in the CSET. Indeed, the careful drafting of the CSET reveals that the legislature expressly sought to erect safeguards against self-incrimination.

## B. The CSET

### 1. Disclosure of self-incriminating information

■ Simply put, the CSET does not require any self-incriminating information. The Cliffts claim that the very act of presenting oneself at a Department of Revenue office is incriminating because government officials can observe a taxpayer's appearance and obtain a description of the taxpayer. This may well be true, but it is irrelevant. The privilege against self-incrimination extends only to testimonial evidence, not to

physical evidence such as appearance. *See Pennsylvania v. Muniz* (1990), 496 U.S. 582, 588–92, 110 S.Ct. 2638, 2643–45, 110 L.Ed.2d 528, 543–46 (and cases cited therein).

The Cliffts are correct that a person who delivers, possesses, or manufactures a controlled substance in violation of relevant state or federal law would incriminate himself by appearing at the Department of Revenue and declaring, "I possess X grams of Y drug, a Schedule Z controlled substance, and I wish to pay the CSET." The CSET, however, does not compel any possessor to make such an incriminating declaration.

The CSET "is due when *the person* receives delivery of, takes possession of, or manufactures a controlled substance in violation of IC 35–48–4 or 21 U.S.C. 841 through 852. *A person* may not be required to reveal *the person's* identity at the time the tax is paid." I.C. 6–7–3–8 (emphasis added). When construing this language, the court's foremost goal is to ascertain and give effect to the true intention of the legislature. *See Johnson County Farm Bureau Co-op. Ass'n, Inc. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 580, *aff'd* (1992), 585 N.E.2d 1336. "In determining the legislative intent [of a statute], the language of the statute itself must be examined, including the grammatical structure of the clause or sentence in issue." *Foremost Life Ins. Co. v. Dep't of Ins.* (1980), 274 Ind. 181, 186, 409 N.E.2d 1092, 1096. *See also Leehaug v. State Bd. of Tax Comm'rs* (1991), Ind.Tax, 583 N.E.2d 211.

I.C. 6–7–3–8 states *when* CSET liability arises against "*the* person [who] receives delivery of, takes possession of, or manufactures a controlled substance." It does not state *who* is obligated to appear before a department official to actually tender the tax due. Instead, the statute simply states that "[a] *person* may not be required to reveal *the person's* identity at the time the tax is paid." Two points about this construction stand out in bold relief.

First, the juxtaposition of an indefinite article ("a") to modify who "may not be required to reveal," and a definite article ("the") to modify whose "identity" may not be revealed, leads necessarily to the inference that anyone, *i.e.,* "a person," may pay the tax for "the person" who owes the tax. In other words, the person liable for the tax may send an agent, who may not be required to divulge the principal's name, to pay the tax. Second, the prohibition against requiring the payor to reveal the identity of the liable person is written in the passive, rather than the active, voice. The phrase "at the time the tax is paid" leaves open the question "paid by whom?" and nowhere does the statute answer that question. *See* William Strunk Jr. and E.B. White, *The Elements of Style* 18 (3d ed. 1979) (discussing the uncertainty of passive constructions). Once again, the inference from the plain meaning of this language is that an agent may pay the tax.[5]

Further, I.C. 6–7–3 lacks altogether any disclosure requirements, whether express or implied, beyond the weight and schedule of the controlled substance being taxed. Nowhere does I.C. 6–7–3 require anyone to disclose an address, a telephone number, a driver's license or other photo identification, a social security number, data about a transferor or transferee, details of an illegal transfer, the location of controlled substances or an illegal manufacturing facility, or any other information that might be subject to the privilege against self-incrimination. Indeed, so devoid is the CSET of any disclosure requirements that it is entirely conceivable the person liable could send an agent to pay the tax without even disclosing his or her name to the agent. This is in stark contrast to the detailed statutory disclosure schemes at issue in the *Marchetti* line of cases.

▪ The CSET does not require any person liable for the CSET to give self-incriminating evidence. Instead, it allows a person liable for the CSET to either pay in person or through an agent, and it prohibits the government from requiring the payor, who-

---

**5.** Moreover, when construing a statute, it is equally important to note what the statute does not say, as well as what it does say. *Irmscher v. McCue* (1987), Ind.App., 504 N.E.2d 1034, 1037.

I.C. 6–7–3–8 does not say "a person may not be required to reveal *his* identity (or *that person's* identity) at the time *he* (or *that person*) pays the tax."

ever that payor may be, to divulge the name of the liable person. Of course, the CSET allows the scenario that the Cliffts postulate to occur, but it does not compel that scenario. The privilege against self-incrimination does not prevent a person from knowingly, intelligently, and voluntarily choosing to make self-incriminating statements; it prevents the government from compelling a person to make self-incriminating statements. *See, e.g., Colorado v. Spring* (1987), 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954. Assuming, *arguendo,* however, that the CSET does indeed compel self-incriminating statements, the issue becomes whether the immunity the CSET provides is sufficient to satisfy the Fifth Amendment.

### 2. Immunity

The privilege against self-incrimination generally prevents the government from compelling self-incriminating evidence. A properly asserted claim of the privilege may nonetheless be defeated if the government grants "an immunity ... coextensive with the privilege being relinquished." *State ex rel. Pollard v. Criminal Court of Marion County, Division One* (1975), 263 Ind. 236, 263, 329 N.E.2d 573, 591 (citing; *Kastigar v. United States* (1972), 406 U.S. 441, 92·S.Ct. 1653, 32 L.Ed.2d 212; *Overman v. State* (1923), 194 Ind. 483, 143 N.E. 604). *See also, e.g., United States v. North* (D.C.Cir., 1990), 910 F.2d 843, 853–54 (citing *Kastigar),* reh'g granted in part on other grounds (1991), 920 F.2d 940, *cert. denied* (1991), 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477. To be valid, a grant of immunity must be coextensive with the privilege. *Murphy v. Waterfront Comm'n* (1964), 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678, 681. The question, then, is whether the statutory immunity under the CSET is coextensive with the privilege.

Three types of immunity may be granted a witness in exchange for his testimony: (1) *transactional immunity:* which prohibits the State from criminally prosecuting the witness for any transaction concerning that to which the witness testifies; (2) *use immunity:* where the testimony compelled of the witness may not be used at a subsequent criminal proceeding; and (3) *deriva-*

*tive use immunity:* whereby any evidence obtained as a result of the witness' compelled testimony may not be admitted against him in a subsequent prosecution.

*In Re Caito* (1984), Ind., 459 N.E.2d 1179, 1182–83 (emphasis in original) (citing *Kastigar; In Re Contempt Findings Against Schultz* (1981), Ind.App., 428 N.E.2d 1284). The protections of the privilege are broadly construed, *Maness* at 461,·95 S.Ct. at 592, 42 L.Ed.2d at 585, and the court is obligated to resolve all reasonable doubts in favor of constitutionality. *State Line Elevator,* 528 N.E.2d at 503 (citing *Bunker v. Nat'l Gypsum Co.* (1982), Ind., 441 N.E.2d 8, 11, *appeal denied,* 460 U.S. 1076, 103 S.Ct. 1761, 76 L.Ed.2d 338).

■ I.C. 6–7–3–9 contains two sentences and provides, "[t]he payment of the tax under this chapter does not make the buyer immune from criminal prosecution. However, confidential information acquired by the department may not be used to *initiate or facilitate prosecution* for an offense other than an offense based on a violation of this chapter." (Emphasis added). The first sentence of the statute denies transactional immunity, but transactional immunity provides broader protection than the privilege and is therefore not necessary to satisfy the Fifth Amendment. *See Kastigar* at 453, 92 S.Ct. at 1660–61, 32 L.Ed.2d at 222.

The second sentence is addressed to the use of "confidential information." The statute does not define "confidential," but because the CSET is a listed tax, IND.CODE 6–8.1–1–1, it is subject to IND.CODE 6–8.1–7–1, which provides in pertinent part:

Unless in accordance with a judicial order or as otherwise provided in this chapter, the department, its employees, former employees, counsel, agents or any other person may not divulge the amount of tax paid by any taxpayer, terms of a settlement agreement executed between a taxpayer and the department, investigation records, investigation reports, or *any other information* disclosed by the reports filed under provisions of the law relating to any of the listed taxes, including required infor-

mation derived from a federal return.... (Emphasis added).

This language is sweeping in its scope and entails all the information the Department acquires when a CSET payment is made.

The confidential information the Department receives cannot be used "to initiate or facilitate prosecution." To "initiate" is "to begin or set going," while to "facilitate" is "to make easier or less difficult." *Webster's Third New Int'l Dictionary* 1164, 812 (1981). This language prevents the government from using confidential information either to begin a prosecution (use immunity) or to ferret out additional incriminating evidence to facilitate a prosecution (derivative use immunity).[6] It is therefore coextensive with the scope of the privilege. *See Kastigar* at 453, 92 S.Ct. at 1660–61, 32 L.Ed.2d at 222.

The CSET does not compel a person liable for the CSET to reveal any self-incriminating information. But even so, the CSET grants use immunity and derivative use immunity over all the confidential information the Department acquires.[7] Therefore, the CSET does not violate the Fifth Amendment's privilege against self-incrimination.[8]

## II

The Cliffts next claim the CSET violates their equal protection rights under the Fourteenth Amendment by creating an unconstitutional exemption from the tax. They are mistaken.

"When determining whether state legislation violates the Fourteenth Amendment's equal protection guarantee, the level of scrutiny applied depends upon the classification made in the challenged legislation." *Pazzaglia v. Review Bd.* (1993), Ind.App., 608 N.E.2d 1375, 1377, *trans. denied.* If the classification does not involve either a suspect class or a fundamental right, the legislation will pass constitutional muster if the classification is "rationally related to a legitimate government purpose." *Id.* (citing *Gary Community Mental Health Center, Inc. v. Indiana Dep't of Pub. Welfare* (1987), Ind. App., 507 N.E.2d 1019, 1023). Suspect classifications include, among others, race and national origin, while fundamental rights concern matters such as freedom of speech and the right to vote. *See Regan v. Taxation with Representation of Washington* (1983), 461 U.S. 540, 547, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129, 137–38; *Thomas v. Greencastle Community School Corp.* (1992), Ind.App, 603 N.E.2d 190, 192. "Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes." *Regan* at 547, 103 S.Ct. at 2002, 76 L.Ed.2d at 138.

People who possess controlled substances are not a suspect class and no fundamental right is at issue. Therefore, the court will set aside the legislative classification only if the Cliffts can show that no "state of facts may reasonably be conceived to justi-

6. A state grant of immunity equally prevents a federal prosecution. *Murphy* at 77–79, 84 S.Ct. at 1609, 12 L.Ed.2d at 694–95.

7. The Cliffts' counsel has presented an affidavit regarding the confidentiality provisions of the CSET. He paid $10.00 to the Department at the Indiana Government Center offices in Indianapolis as payment for 1 gram of a Schedule 5 substance. He avers he informed no one outside his office of his plan to pay the tax, but within two hours of the time he left the Department, a television reporter contacted him to discuss the payment. *Affidavit of Andrew C. Maternowski.* The inference counsel draws is that Department personnel, ignoring the confidentiality provisions, informed the reporter of counsel's acts.

The court need not enter into any speculation on this matter. Our supreme court and the United States Supreme Court have taken into account the possibility of improper prosecutorial

use of immunized testimony. If evidence is revealed under a grant of immunity, the prosecution in related matters "bears the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *In Re Caito*, 459 N.E.2d at 1184 (quoting *Kastigar* at 460, 92 S.Ct. at 1665, 32 L.Ed.2d at 226).

8. For other decisions analyzing and upholding state controlled substance taxes against self-incrimination challenges, see *State v. Durrant* (1989), 244 Kan. 522, 769 P.2d 1174, *cert. denied* (1989), 492 U.S. 923, 109 S.Ct. 3254, 106 L.Ed.2d 600; *Sisson v. Triplett* (1988), Minn., 428 N.W.2d 565, *State v. Davis* (1990), Utah App., 787 P.2d 517. In each of these cases, the state statutory scheme was similar to Indiana's, and the courts noted the differences between the statutes under consideration and the statutes in the *Marchetti* cases.

fy it." *Kleiman v. State* (1992), Ind.App., 590 N.E.2d 660, 663 (citing *Parker v. State* (1980), Ind.App., 400 N.E.2d 796).[9]

IND.CODE 6–7–3–5 provides:

The controlled substance excise tax is imposed on controlled substances that are:

   (1) delivered;

   (2) possessed; or

   (3) manufactured;

in Indiana in violation of IC 35–48–4 or 21 U.S.C. 841 through 852. *The tax does not apply to a controlled substance that is distributed, manufactured, or dispensed by a person registered under IC 35–48–3.*

(Emphasis added). I.C. 35–48–3 contains the registration requirements and limitations for physicians, pharmacists, dentists, pharmaceutical manufacturers, and others to legally possess, manufacture, distribute, and dispense controlled substances within Indiana. Specifically, IND.CODE 35–48–3–3(c) provides that "[p]ersons registered . . . to manufacture, distribute, dispense, or conduct research with controlled substances may possess, manufacture, distribute, dispense, or conduct research with those substances *to the extent authorized by their registration* and in conformity with the other provisions of this chapter." (Emphasis added). The Cliffts argue that the CSET treats persons registered under I.C. 35–48–3 differently from the way it treats persons who are not registered under I.C. 35–48–3 and, therefore, violates equal protection. No detailed equal protection analysis is necessary to resolve the issue, however, because IC 6–7–3–5 does not discriminate.[10]

The court construes statutes dealing with the same subject matter harmoniously. *Caylor–Nickel Clinic, P.C. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 569 N.E.2d 765, 768 (citing *Marion County Sheriff's Merit Board v. Peoples Broadcasting Corp.* (1989), Ind., 547 N.E.2d 235, 237), *aff'd*

(1992), Ind., 587 N.E.2d 1311. Moreover, the court must construe all statutes to support their constitutionality. *Miller v. State* (1987), Ind., 517 N.E.2d 64, 71.

In *Tobias v. State* (1985), Ind., 479 N.E.2d 508, our supreme court affirmed the conviction of a pharmacist, registered under I.C. 35–48–3, who had been convicted of Class A felony narcotics dealing under I.C. 35–48–4–1. The court expressly rejected the pharmacist's claim that his registration precluded the possibility he could violate I.C. 35–48–4. *Id.* at 511. Similarly, the United States Supreme Court has stated that 21 U.S.C. § 822(b), which is almost identical to I.C. 35–48–3–3(c), "is a qualified authorization of certain activities, not a blanket authorization of all acts by certain persons." *United States v. Moore* (1975), 423 U.S. 122, 131, 96 S.Ct. 335, 340, 46 L.Ed.2d 333, 341. *See also Alarcon v. State* (1991), Ind.App., 573 N.E.2d 477, *trans. denied.* The lesson is clear: a person registered under I.C. 35–48–3 is no more authorized to violate I.C. 35–48–4 or 21 U.S.C. 841 through 852 than a person who is not registered.

Because an I.C. 35–48–3 registration is a nullity as to activities and controlled substances beyond its scope, any person who delivers, possesses, or manufactures a controlled substance in violation I.C. 35–48–4 or 21 U.S.C. 841 through 852, is simply not "registered under IC 35–48–3" for purposes of the CSET. The CSET therefore does not discriminate between I.C. 35–48–3 registrants and non-registrants. There is no equal protection violation.

### III

■ The Cliffts did not pay the CSET when it was due. Instead, the Department learned of the Cliffts' possession from law enforcement officials and assessed the CSET against the Cliffts pursuant to I.C. 6–7–3–13 as a jeopardy assessment under IND.CODE

---

**9.** The Cliffts suggest their arguments warrant the intermediate level of scrutiny generally applicable to sex or legitimacy based discriminatory classifications. *See, e.g., Clark v. Jeter* (1988), 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465, 471–72 (discussing intermediate scrutiny). They point to no authority however, and the court declines their suggestion. The

rational basis test is applicable here. *Pazzaglia,* 608 N.E.2d at 1377.

**10.** It is the court's duty to refrain from consideration of constitutional questions if there are other grounds on which to base a decision. *Harlan Sprague Dawley,* 605 N.E.2d at 1232.

6–8.1–5–3. If the Department issues a jeopardy assessment, and the assessment is not paid immediately, I.C. 6–8.1–5–3 authorizes the Department, without notice or hearing, to levy on and sell the property of the person against whom the assessment was made. The Cliffts contend these procedures deprive them of their property in violation of their Fourteenth Amendment procedural due process rights.

■ "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge* (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (quoting *Armstrong v. Manzo* (1965), 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62). *See also City of Mitchell v. Graves* (1993), Ind.App., 612 N.E.2d 149, 152. "'Due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Matthews* at 334, 96 S.Ct. at 902, 47 L.Ed.2d at 33 (quoting *Cafeteria Workers v. McElroy* (1961), 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230). It "is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer* (1972), 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484).

The court need not tarry long on the Clifft's claim because they have suffered no due process violation. The Cliffts protested the Department's November 9, 1992, jeopardy assessment. The Department held a hearing on March 5, 1993 and entered its letter of findings denying the protest on May 12, 1993. The Cliffts bring this appeal pursuant to IND.CODE 6–8.1–5–1 from that letter of findings. They have presented no evidence that the Department took any measures to collect on the jeopardy assessment, whether between November 9, 1992, and May 12, 1993, or since. Therefore, the Cliffts received an administrative hearing and judicial review prior to suffering any deprivation of their property: due process can require no more.

Furthermore, although the Department may proceed on a CSET or other jeopardy assessment without providing the taxpayer pre-deprivation notice or opportunity to be heard, this court has the jurisdiction and authority to enjoin the Department's collection activities pending the initiation of an original tax appeal. IND.CODE 33–3–5–11(b); *American Trucking Ass'n v. State* (1987), Ind.Tax, 512 N.E.2d 920. The right to a meaningful hearing contemplates review in a court of competent jurisdiction. *See McCallip v. State* (1991), Ind.App., 580 N.E.2d 278, 279.

The moment a person receives a jeopardy assessment with its concomitant payment demand, and before a tax warrant is issued and collection efforts begin, the person assessed has the ability to seek injunctive relief from this court. This procedure allows for review in a meaningful time and a meaningful manner before a court of competent jurisdiction and satisfies due process.

### IV

■ Finally, the Cliffts argue that the tax constitutes double jeopardy under the United States Supreme Court's recent decision in *Department of Revenue v. Kurth Ranch* (1994), —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767.[11] In *Kurth Ranch*, the Court for the first time subjected a tax statute to double jeopardy analysis, holding that Montana's Dangerous Drug Tax (DDT) was "a second punishment within the contemplation of [the Fifth Amendment]...." *Id.,* —— U.S. at ——, 114 S.Ct. at 1948, 128 L.Ed.2d at 782. Like the Cliffts, the Kurths cultivated marijuana. Like the Cliffts, the Kurths' marijuana was confiscated and the Kurths were arrested and prosecuted. *Id.,* —— U.S. at —— – ——, 114 S.Ct. at 1942–43, 128 L.Ed.2d at 774–75. The case reached the Supreme Court in the context of the Kurths' Chapter 11 bankruptcy proceedings.

The Court analyzed the Montana scheme and found several features that led the majority to conclude the DDT was actually a

11. The Fifth Amendment states that "No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb...." Through the Fourteenth Amendment, the prohibition against double jeopardy applies to the states. *Benton v. Maryland* (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707.

punishment for double jeopardy purposes. First, the Court noted that taxes "are usually motivated by revenue-raising rather than punitive purposes." *Id.,* —— U.S. at ——, 114 S.Ct. at 1946, 128 L.Ed.2d at 779. The DDT, however, while denominated as a tax, also had a strong deterrent purpose. *Id.* Second, the Court characterized the rate of the DDT applicable to marijuana (roughly eight times then current market value) as "remarkably high...." *Id.* The DDT assessed on marijuana is the greater of $100 per ounce or 10 percent of market value. MONT. CODE ANN. § 15–25–111.[12] Third, the DDT was "conditioned on the commission of a crime.... [which is] 'significant of penal and prohibitory intent rather than the gathering of revenue.'" *Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1947, 128 L.Ed.2d at 779–80 (quoting *United States v. Constantine* (1935), 296 U.S. 287, 295, 56 S.Ct. 223, 227, 80 L.Ed. 233).[13]

Fourth, although the DDT was imposed on "the possession and storage of dangerous drugs," MONT.CODE ANN. 15–25–111, the enforcement scheme did not mandate assessment, filing, and payment until arrest. *Kurth Ranch,* —— U.S. at —— – ——, 114 S.Ct. at 1941–42, 1947, 128 L.Ed.2d at 773–74, 780. In other words, the DDT was "exacted only after the taxpayer has been arrested for the precise conduct that gives rise to the tax obligation in the first place." *Id.,* —— U.S. at ——, 114 S.Ct. at 1947, 128 L.Ed.2d at 780. Finally, the Court questioned the imposition of a tax based on possession when, in actuality, taxpayers were deprived of possession by the time of assessment. Because assessment occurred only after arrest, the authorities would have confiscated, and likely destroyed the drugs for which the DDT was due before assessment even occurred. *Id.,* —— U.S. at ——, 114 S.Ct. at 1948, 128 L.Ed.2d at 780–81.

The CSET contains many of the same elements as Montana's DDT. First, the CSET has a deterrent purpose. The Department is required to give all CSET payors a receipt with the following language: "THIS EVIDENCE OF PAYMENT DOES NOT LEGALIZE THE DELIVERY, SALE, POSSESSION, OR MANUFACTURE OF A CONTROLLED SUBSTANCE. THE UNAUTHORIZED DELIVERY, SALE, POSSESSION, OR MANUFACTURE OF A CONTROLLED SUBSTANCE IS A CRIME." IND.CODE 6–7–3–10(a) (emphasis in original). The *Kurth Ranch* court viewed similar admonitory language in the DDT's preamble as evidence of a deterrent purpose. *Kurth Ranch,* —— U.S. at ——, n. 18, 114 S.Ct. at 1946, n. 18, 128 L.Ed.2d at 779, n. 18. Further, like revenue raised by the DDT, revenue from the CSET is to be channeled into drug abuse prevention and criminal investigation. *See* IND.CODE 6–7–3–16; MONT.CODE ANN. § 15–25–122.

Second, the Montana taxing authorities imposed the DDT against the Kurths at the rate of $100 per ounce, a rate roughly eight times the market value of a substantial portion of the marijuana taxed. *Kurth Ranch,* —— U.S. at ——, n. 12, 114 S.Ct. at 1943, n. 12, 128 L.Ed.2d at 775, n. 12. The CSET on marijuana is $40 per gram, or $1,133.96 per ounce.[14] Therefore, using the same figures the *Kurth Ranch* court used, the CSET taxes marijuana at a rate of over ninety times market value.[15] As in *Kurth Ranch,* both of these factors "are at least consistent with a

---

12. The Court acknowledged that "while a high tax rate and deterrent purpose lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive." *Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1947, 128 L.Ed.2d at 779. The presence of additional unusual factors, however, persuaded the Court the DDT was a punishment.

13. Not all taxes on controlled substances are conditioned on the commission of a crime. *See id.,* —— U.S. at ——, n. 19, 20, 114 S.Ct. at 1947, n. 19, 20, 128 L.Ed.2d at 780, n. 19, 20. The DDT, and as will be seen *infra,* the CSET, however, are conditioned expressly and solely on the violation of criminal statutes.

14. One ounce equals 28.349 grams. *Websters, supra,* at 1424.

15. In *Kurth Ranch,* the Court stated the rate of the DDT "appear[ed] to be unrivaled." *Id.,* —— U.S. at ——, n. 17, 114 S.Ct. at 1946, n. 17, 128 L.Ed.2d at 779, n. 17. The DDT has met its rival in the CSET, however, which has a rate per ounce of marijuana more than eleven times greater than the DDT's.

punitive character." *Id.,* ── U.S. at ──, 114 S.Ct. at 1946, 128 L.Ed.2d at 779.

Third, like the DDT, the CSET is conditioned on the commission of a crime. The CSET "is imposed on controlled substances that are: (1) delivered; (2) possessed; or (3) manufactured; in Indiana *in violation of IC 35–48–4 or 21 U.S.C. 841 through 852.*" I.C. 6–7–3–5 (emphasis added). Therefore, the only people subject to the CSET are those who, by definition, have engaged in criminal conduct.

Fourth, the CSET allows assessment after confiscation of the controlled substances on which the assessment is made. Indeed, this is precisely what occurred in the case at bar. After law enforcement authorities arrested and charged the Cliffts and confiscated the marijuana, they informed the Department of the Cliffts' identity and the number of grams of marijuana. At that point, the Department made its assessment, notwithstanding that the Kurths no longer possessed the marijuana at issue. Unlike the DDT, however, CSET assessment may also occur prior to arrest because the obligation to pay the tax arises on delivery, possession, or manufacture, and is not necessarily related to arrest.

Like the DDT, the CSET is an unusual tax, with elements of both taxation and punishment. It is not exactly like the DDT: assessment does not require arrest. The *Kurth Ranch* court, however, did not hold that a tax must contain each of the DDT's "punishment" aspects, or only the DDT's "punishment" aspects, to constitute a punishment within the meaning of the double jeopardy clause. Instead, the Court held, "[t]aken as a whole, this drug tax is a concoction of

anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of Double Jeopardy analysis." *Id.,* ── U.S. at ──, 114 S.Ct. at 1948, 128 L.Ed.2d at 781. Indeed, it could hardly be otherwise since each state and federal tax on the possession of controlled substances will differ from the next, as the CSET differs from the DDT.

Given the strong similarities between the DDT and the CSET, coupled with the *Kurth Ranch* court's decision not to lay down a definitive test, the court views *Kurth Ranch* as controlling. Therefore, the court holds the CSET is a punishment, which "must be imposed during the first prosecution or not at all." *Id.,* ── U.S. at ──, 114 S.Ct. at 1948, 128 L.Ed.2d at 782.

## CONCLUSION

The CSET does not violate the privilege against self-incrimination, the right of equal protection, or the right of due process. Because there is no genuine issue of material fact on these questions and the Department is entitled to judgment as a matter of law, the court now GRANTS the Department's cross motion for partial summary judgment in part.

The CSET, however, is a punishment for double jeopardy purposes. Therefore, the Department may not collect the tax from Mrs. Clifft, who has already pled guilty to Class A misdemeanor possession.[16] On the other hand, because jeopardy has not attached in any criminal action against Mr. Clifft, double jeopardy does not bar collection

---

**16.** This appeal, like *Kurth Ranch,* "does not raise the question whether an ostensibly civil proceeding that is designed to inflict punishment may bar a subsequent proceeding that is admittedly criminal in character." *Kurth Ranch,* ── U.S. at ──, n. 21, 114 S.Ct. at 1947, n. 21, 128 L.Ed.2d at 780, n. 21. *See also id.,* ── U.S. at ──── ──, 114 S.Ct. at 1958–59, 128 L.Ed.2d at 794 (Scalia, J. dissenting).

The date of the tax assessment, however, does not control. The Kurths were arrested in October 1987, and the Montana Department of Revenue assessed the DDT against the Kurths on December 7, 1987. *See In re Kurth Ranch* (1990), Bankr.D.Mont., 145 B.R. 61, 67. The Kurths did not plead guilty on the criminal

charges related to the DDT until July 1988. *See Kurth Ranch,* ── U.S. at ──, 114 S.Ct. at 1942, 128 L.Ed.2d at 774; *In re Kurth Ranch* (1993), 9th Cir., 986 F.2d 1308, 1310. In this case, Mrs. Clifft was arrested on October 8, 1992 and assessed on November 9, 1992. The municipal court accepted her plea agreement on January 14, 1993.

The court notes that related issues have begun working their way through the courts. A few weeks after the *Kurth Ranch* decision, in an opinion not yet released for publication, a divided Texas Court of Appeals panel held double jeopardy barred a criminal trial after a pretrial civil forfeiture was assessed from the defendant. *Fant v. State* (1994), 881 S.W.2d 830 (14th Dist.).

of the tax from him. There is no genuine issue of material fact on this question, and Mrs. Clifft is entitled to judgment as a matter of law. The court therefore GRANTS the Cliffts' cross motion for partial summary judgment in part.[17]

---

17. In addition to their state constitutional claims, the Cliffts also raised issues regarding the Fourth and Eight Amendment claims, as well as a claim under 42 U.S.C. § 1983. These were not included within the summary judgment motions, however, and remain for trial.